**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 06-447** |
| | : | |
| **v.** | : | |
| | : | |
| **BRIAN J. NEWMARK** | : | |
| **JOHN N. WIGHT** | : | |
| **Defendants.** | : | |

**M E M O R A N D U M   A N D   O R D E R**

PRATTER, J.                                                                                                    APRIL 4, 2008

PROCEDURAL BACKGROUND

A federal grand jury returned an Indictment on August 30, 2006, charging Brian J.

Newmark and John N. Wight with violations of the federal mail and wire fraud statutes, and

charging Mr. Newmark with making a false declaration under oath.  The underpinnings of the

charges were investment and estate planning transactions involving two elderly brothers, Arthur

and Thomas Walker.  The Defendants filed several pretrial motions seeking to dismiss the

Indictment, all of which the Court dismissed by Memorandum and Order dated March 14, 2007.

A jury trial commenced on October 15, 2007, and on October 24, 2007, the jury rendered

a partial verdict.  The jury convicted Mr. Newmark of one count of wire fraud (Count One of the

Indictment), one count of mail fraud (Count Three), and one count of making a false statement

under oath (Count Five).  The jury acquitted Mr. Newmark on one count of mail fraud (Count

Four), and the Court dismissed one count of wire fraud (Count Two) following the conclusion of

the Government's case.  (See Trial Tr. vol. 5, 2:23-3:2, Oct. 19, 2007.)[1]  The jury acquitted Mr.

_____

[1] At the close of the Government's case, both Defendants moved for a judgment of
acquittal as to all charges under Rule 29(a) of the Federal Rules of Criminal Procedure.  Count
Two of the Indictment charged that Mr. Newmark violated the federal wire fraud statute, 18
U.S.C. § 1343, when on August 31, 2001 he made a telephone call using the telephone number

Wight on Counts One and Three, but was not able to reach a decision with respect to Mr. Wight

on Count Four.  The Court declared a mistrial as to Mr. Wight on that Count.

Both Defendants moved for a judgment of acquittal at the close of the Government's case

under Rule 29(a), and renewed those motions at the close of the entire case.  In both instances,

the Court reserved its decision on those motions.  After the jury convicted Mr. Newmark on

Counts One, Three and Five, he renewed his motions under Rule 29(c).  In addition, Mr.

Newmark moves for a new trial under Rule 33(a), and moves to arrest judgment under Rule

34(a).  Mr. Wight also moves for a judgment of acquittal under Rule 29(c) with respect to Count

---

(610) 348-8000 to call Morgan Stanley in New York.  Court Two also charged Mr. Wight with
aiding and abetting Mr. Newmark's alleged violation.

The Defendants moved to dismiss this Count, arguing that the Government failed to
prove that Mr. Newmark used the telephone number charged in the Indictment to place the call.
The only evidence the Government presented that Mr. Newmark actually used this particular
telephone number was the testimony of Chris Zeyer, the Morgan Stanley representative with
whom Mr. Newmark spoke on that date.  At trial, Mr. Zeyer testified that after he had spoken
with Mr. Newmark, he completed a "verbal complaint form" to memorialize the conversation.
On that form, Mr. Zeyer had listed as Mr. Newmark's telephone number the number charged in
the Indictment. However, at trial Mr. Zeyer testified that he was not sure where he had obtained
the telephone number.  Mr. Zeyer testified that either Mr. Newmark gave him the telephone
number (610) 348-8000 or the number came from Morgan Stanley's account files for Arthur or
Thomas Walker.  (Trial Tr. C. Zeyer 8:18-9:14, Oct. 17, 2007.)

In the Government's written response to the defense motions at the close of the
Government's case, the Government "concede[d] that the proofs at trial concerning the use of
telephone number 610-348-8000 are likely insufficient to demonstrate beyond a reasonable doubt
that defendant used this telephone number on August 31, 2001 to contact Mr. Zeyer." (Gov't
Resp. 10.)  On October 19, 2007, the Court informed counsel for all parties that the Court would
dismiss Count Two of the Indictment.  (Trial Tr. vol. 5, 2:23-3:2, Oct. 19, 2007.) The
Government did not object to the Court's dismissal of Count Two.

At that time, no formal docket entry was made to reflect the dismissal of Count Two.
However, counsel and the parties understood that Count Two had been dismissed, and that Count
was not submitted to the jury.  The Order accompanying this Memorandum will reflect that a
judgment of acquittal pursuant to Rule 29(a) will be entered as to Count Two with respect to both
Defendants, based on the Court's October 19, 2007 ruling that the Government did not present
sufficient evidence to prove beyond a reasonable doubt that Mr. Newmark used the telephone
number charged in the Indictment.

Four.

The parties have filed numerous motions and supporting memoranda.[2]  The Court

presided over oral argument on Mr. Newmark's motions on January 2, 2008.  Following the oral

argument, counsel for both Mr. Newmark and the United States submitted additional letter briefs

seeking to clarify certain issues raised during oral argument.

Each of the defense motions, and the Government's respective responses, are discussed

below.  Mr. Newmark's Rule 29 Motion will be granted in part and denied in part, and the Court

will enter a judgment of acquittal on Counts Two, Three and Five.  In addition, Mr. Wight's Rule

29 Motion will be granted, and a judgment of acquittal will be entered on Counts Two and Four.

FACTUAL BACKGROUND

The following statement represents a brief summary of the evidence that was presented at

trial.  As appropriate, the evidence is viewed and discussed below in the light most favorable to

the Government.

---

[2] Mr. Newmark submitted a Motion for Acquittal Under Rule 29(a) at the close of the Government's case (Docket No. 96), a Supplemental Brief in support of his Rule 29(a) Motion at the close of the Government's case (Docket No. 110), a Motion for Acquittal Under Rule 29(c), New Trial Under Rule 33(a), and Arrest of Judgment Under 34(a) (Docket No. 111).  The Government filed a response to Mr. Newmark's Rule 29 motion (Docket No. 98), and an omnibus response to Mr. Newmark's Rule 29, 33 and 34 motions (Docket Nos. 116, 117).  Mr. Newmark filed an omnibus reply brief (Docket No. 118).

After the transcripts of the trial proceedings became available, the parties supplemented their motion papers to include references to those transcripts.  Mr. Newmark's "annotated" motion papers were filed at Docket Nos. 131-133, and the Government's annotated response was filed at Docket No. 134.

Mr. Wight filed a Motion for Judgment of Acquittal on Count Four Pursuant to Rule 29 (Docket No. 109).

Each of the filings presented to the Court represents fine professional work by counsel, and the Court compliments counsel and their colleagues for their diligence, in-depth analysis and critical thinking displayed in all of the written and oral submissions.

Mr. Newmark owned and controlled various companies that operated within the Commonwealth of Pennsylvania, including BEN Consulting and Funding and Financial Services ("FFS"), which was the predecessor to Estate Planning Advisors Corp. ("EPA"), among others. Mr. Newmark's companies performed advertising and marketing services for Barry Bohmueller, an attorney then licensed to practice in Pennsylvania who specialized in estate planning services. Mr. Newmark is not and never has been an attorney.

Specifically, Mr. Newmark's companies advertised and marketed Mr. Bohmueller's estate planning services, including wills, trusts, powers-of-attorney, etc., through direct mail campaigns and telephone solicitations. Mr. Newmark's promotional efforts on behalf of Mr. Bohmueller targeted individual homeowners over the age of 60 with annual incomes in excess of $15,000. Mr. Newmark's companies employed various individuals, including Victoria Larson, and engaged independent contractors, such as Mr. Wight. Neither Mr. Wight nor Ms. Larson is or ever has been an attorney.

Arthur and Thomas Walker were elderly brothers[3] who lived together in Tunkhannock, Pennsylvania[4] in a house that they jointly owned. The Walker brothers previously owned a granite company, and had lived together in Tunkhannock for over 50 years. They also owned a house in Florida. Together, at the time of the operative events, the Walker brothers owned assets

---

[3] Both of the Walkers were in their 80's during the time period involved here. When the Walkers first encountered the Defendants, Arthur Walker was 80 years old and Thomas Walker was 82. Thomas Walker was 88 years old when he testified in this criminal trial. Arthur Walker passed away during 2006 before these criminal proceedings began.

[4] Tunkhannock is located in northeastern Pennsylvania, some 125 miles from suburban Philadelphia where Mr. Bohmueller practiced and where Mr. Newmark maintained his businesses.

valued in excess of $3.5 million.

Victoria Lawson initially placed a sales call to the Walkers' home on June 27, 2001, during which she described various estate planning services that Mr. Bohmueller could provide to them.[5]  The Walkers expressed interest in Mr. Bohmueller's services, and Ms. Lawson arranged for Mr. Bohmueller to draft certain trust instruments and ancillary documents for the Walkers.

Shortly thereafter, on July 20, 2001, Mr. Wight personally delivered to the Walkers ostensibly on behalf of Mr. Bohmueller a revocable living trust, financial and durable powers of attorney, a living will, and a "pour-over will," all of which were documents that Mr. Bohmueller had drafted.  Mr. Wight visited with the Walkers in their home and explained the legal documents to them.

Once the Walkers were prepared to execute the documents, they called upon their neighbors, Gertrude and Murray Fisk, to witness their signatures.  One of the Walkers introduced Mr. Wight to the Fisks as the Walkers' attorney.  Hearing this introduction, Mr. Wight did not correct the misstatement that he was an attorney.  In the presence of the Fisks and Mr. Wight, Arthur and Thomas Walker each proceeded to execute a revocable living trust, financial and durable powers of attorney, a living will, and a pour-over will.  Mr. Wight notarized the various documents.

After the Walkers executed the wills and trust documents, Mr. Wight endeavored to sell

---

[5] No evidence was presented as to the circumstances that led to Ms. Larson's first visit to the Walkers' home, so that it was not known whether she arrived out of the blue, whether the Walkers responded to a mass-mailing or solicitation telephone call from one of Mr. Newmark's companies, whether the Walkers were the ones to initiate contact with Ms. Larson, or otherwise.

to the Walkers various insurance-related and financial products.  After discussing the Walkers'

investment objectives with them, Mr. Wight sought Mr. Newmark's advice as to what might be

an appropriate investment opportunity for the Walkers.  Mr. Newmark suggested that Mr. Wight

should recommend selling the Walkers a charitable gift annuity offered through New Life

Corporation of America ("New Life").[6]  Mr. Newmark never met with the Walkers personally at

any time.

Mr. Wight visited the Walker home on a number of other occasions following his first

meeting with the Walkers on July 20, 2001.  During these visits, Mr. Wight learned that the

Walkers owned and possessed stock certificates representing approximately $2 million worth of

securities.[7]  In addition, the Walkers informed Mr. Wight that the Scranton branch of the Morgan

Stanley brokerage firm managed an investment portfolio worth approximately $1.2 million for

the Walkers.

After several meetings with the Walkers, in early August Mr. Wight persuaded the

Walkers to purchase charitable gift annuities through New Life.  He also persuaded them to fund

the annuities using the bulk of their net worth, i.e., approximately $3.5 million.  On August 3,

2001, Mr. Wight again visited the Walkers' home, where the Walkers executed contracts to

purchase four annuities, two annuities each.  The Walkers eventually executed contracts to

purchase six annuities total, three apiece.

Purchasing the annuities recommended by Mr. Newmark required the Walkers to

---

[6] National Community Foundation ("NCF") is a division of New Life, and is a tax-exempt charitable organization.  NCF is New Life's charitable arm.

[7] The Walkers kept nearly $2 million worth of stock certificates in a safe in their garage in Tunkhannock.

liquidate and transfer their assets that were being managed by Morgan Stanley.  On or around August 21, 2001, after Morgan Stanley learned that the Walkers intended to liquidate these assets, Perry Rose, a Morgan Stanley representative from the brokerage firm's Scranton office, visited the Walkers' home.  He reviewed documents relating to the New Life annuities and informed the Walkers that, in his view, they did not have to purchase the annuities in order accomplish their estate planning goals.  Mr. Rose brought with him to the Walkers' home letters that he had drafted rescinding the liquidation instructions, which letters the Walkers signed.  By doing so, the Walkers rescinded their direction to Morgan Stanley to liquidate and transfer their assets to New Life.

The next day, August 22, 2001, after becoming aware of Mr. Rose's visit, Mr. Wight visited the Walkers at home and convinced them once again to proceed with the purchase of the New Life annuities.  Mr. Wight had brought a portable fax machine with him to the Walkers' home.  Mr. Wight conveyed certain information about Mr. Rose's visit to Mr. Newmark over the telephone.  Mr. Newmark then used that information to compose two identical letters nominally from Arthur and Thomas Walker, respectively, addressed to Morgan Stanley's Scranton branch office complaining about Mr. Rose's visit to the Walkers' home.  Mr. Newmark faxed those letters to Mr. Wight, which were then given by Mr. Wight to the Walkers, signed by them and then faxed to Morgan Stanley's Scranton branch office on August 22, 2001.

A week later, Mr. Wight visited the Walkers' home again.  Mr. Wight  brought with him the portable fax machine and two letters that had been drafted by Mr. Newmark and someone from New Life.  Again, the letters were drafted to be nominally from Arthur and Thomas Walker, respectively, and were identical in all respects, other than the signatory.  Each letter complains

that Morgan Stanley had not complied with the Walkers' requests to transfer the Walkers' funds to New Life, and instructs Morgan Stanley to complete the transfer immediately.  Mr. Wight obtained the Walkers' signatures on the respective letters, and the letters were faxed to Morgan Stanley's legal department in New York City on August 29, 2001.

By August 31, 2001, Morgan Stanley still had not transferred the Walkers' funds to New Life.  On that date, Mr. Newmark called Morgan Stanley's compliance department in its New York City office and spoke with Chris Zeyer, who was a complaint analyst.  Mr. Newmark informed Mr. Zeyer that the Walkers had authorized Morgan Stanley to transfer the Walkers' funds to New Life on August 3, 2001.  He described Mr. Rose's visit to the Walkers' home, and informed Mr. Zeyer about the letters from the Walkers to Morgan Stanley complaining about Mr. Rose.  Mr. Newmark also informed Mr. Zeyer that on August 29, 2001, additional authorization letters from the Walkers were sent to Morgan Stanley's legal department authorizing Morgan Stanley to transfer the Walkers' funds to New Life.

On the same day that he spoke with Mr. Zeyer, Mr. Newmark sent a facsimile transmittal sheet to Mr. Zeyer on the letterhead of the "Bohmueller Law Offices."  In this fax, Mr. Newmark referred to the Walkers as "my clients" and requested Morgan Stanley's immediate attention in order to "resolve" the matter at hand, namely, Morgan Stanley's failure to transfer the Walkers' funds to New Life per the Walkers' requests.  Mr. Newmark attached to this communication the several letters described above, which purported to be from either Arthur or Thomas Walker, and which directed Morgan Stanley to execute the requested transfer.  This August 31, 2001 facsimile transmission formed the basis for Count One of the Indictment.

After receiving Mr. Newmark's call, Mr. Zeyer completed a "verbal complaint form" in

which he memorialized his conversation with Mr. Newmark.  On this form, Mr. Zeyer identified

Mr. Newmark as "Attorney for Arthur and Thomas Walker."

Mr. Zeyer agreed to contact the Scranton branch office to follow up on Mr. Newmark's

complaint.  To that end, he forwarded to the Scranton branch office all of the materials that Mr.

Newmark had submitted, together with the verbal complaint form, to the attention of Ralph Colo,

the Scranton branch manager.  Mr. Colo called Mr. Newmark to inquire about his complaint but

was not able to reach him.

Morgan Stanley eventually released the Walkers' assets, enabling the Walkers to

purchase six annuities from New Life.  The Walkers paid approximately $3,522,244 for the

annuities.  A significant percentage of this purchase price constituted a charitable "gift" to NCF,

New Life's charitable arm.  Mr. Newmark's company, FFS, earned approximately $230,408 in

commissions for these transactions, from which it paid Mr. Wight a commission of

approximately $69,740.  The annuities Thomas Walker purchased provided him with $13,287.77

in monthly income, while the annuities purchased by Arthur Walker provided him with

$13,606.79 in monthly income.  The Walkers received these annuity payments through the end of

2003.

After the sale, Mr. Wight made several more visits to the Walkers' homes, both in

Pennsylvania and in Florida.  Mr. Wight did not attempt to sell the Walkers any additional

annuities or other financial products once the original transactions were consummated in the fall

of 2001.

Eventually, the Walkers came to feel that something about the New Life annuities was

out of the ordinary.  The annuities performed as advertised, including providing the Walkers with

a continuous, monthly income stream.  It seems, however, that the Walkers may have realized

that these annuities may not have been the most beneficial or cost-effective way to accomplish

their estate planning objectives.  In 2003, the Walkers hired an attorney, Gary Lightman, and in

June 2003, they sued Mr. Newmark and Mr. Wight, among others, in federal court.[8]

As part of discovery in the civil suit, both Messrs. Newmark and Wight stated in their

respective responses to interrogatories that they had never represented themselves as attorneys for

the Walkers.  Messrs. Newmark's and Wight's interrogatory responses in the civil suit were

mailed on December 16, 2003 and December 17, 2003, respectively.  These December 16, 2003

and December 17, 2003 mailings formed the basis for Counts Three and Four of the Indictment.

In addition, during his January 21, 2004 oral deposition in the civil suit, Mr. Newmark testified

under oath that he had never represented himself as an attorney for the Walkers.  Mr. Newmark's

allegedly false deposition statement formed the basis for Count Five of the Indictment.

The civil lawsuit settled in 2003.  As part of the settlement, the Walkers received a total

of $2.9 million in cash, over and above the combined total of $723,172.69 in monthly annuity

payments which they had already received.

## DISCUSSION

## I.    MR. NEWMARK'S MOTION FOR ACQUITTAL UNDER RULE 29

### A.    Legal Standard Under Rule 29

Rule 29(a) provides as follows:

(a) Before Submission to the Jury. After the government closes its evidence or after
the close of all the evidence, the court on the defendant's motion must enter a

---

[8] The Walkers filed their civil action in the Eastern District of Pennsylvania, docketed as
Civil Action No. 03-3750.

judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction.  The court may on its own consider whether the evidence is insufficient to sustain a conviction. If the court denies a motion for a judgment of acquittal at the close of the government's evidence, the defendant may offer evidence without having reserved the right to do so.

Fed. R. Crim. P. 29(a).

Rule 29(b) provides that the district court may reserve decision on the motion:

(b) Reserving Decision. The court may reserve decision on the motion, proceed with the trial (where the motion is made before the close of all the evidence), submit the case to the jury, and decide the motion either before the jury returns a verdict or after it returns a verdict of guilty or is discharged without having returned a verdict.  If the court reserves decision, it must decide the motion on the basis of the evidence at the time the ruling was reserved.

Fed. R. Crim. P. 29(b).

Rule 29(c) provides that the defendant may renew his motion for acquittal within seven days after the jury reached a verdict, and that if the jury has returned a guilty verdict , the court may set aside the verdict and enter an acquittal.  Fed. R. Crim. P. 29(c).

In considering a Rule 29 motion, the Court must review the evidence in the light most favorable to the Government.  United States v. McKee, 506 F.3d 225, 232 (3d Cir. 2007).  The Court does not re-weigh the evidence or re-assess witness credibility.  Id. (citing United States v. Peppers, 302 F.3d 120, 126 (3d Cir. 2002)).  Accordingly, the Court must sustain the verdict "'if a rational trier of fact could have found [the] defendant guilty beyond a reasonable doubt, and the verdict is supported by substantial evidence.'"  Id. (quoting United States v. Coyle, 63 F.3d 1239, 1243 (3d Cir. 1995)).  If there is substantial evidence to support the jury's determination, the Court will "'not disturb the verdict although on that evidence [the Court] might not have made the same decision.'"  Id. at 232-33 (quoting United States v. Cooper, 121 F.3d 130, 133 (3d Cir.

1997) (citing United States v. Hannigan, 27 F.3d 890, 892 (3d Cir. 1994))).  Thus, the Court's

"inquiry is limited to determining whether the jury's verdict is permissible."  Id. at 233 (citing

United States v. McGill, 964 F.2d 222, 229 (3d Cir. 1992)).  The Court is obliged to refrain from

casting itself as a new, one-person jury.

   After the Government rested its case-in-chief here, Mr. Newmark timely moved for

acquittal pursuant to Rule 29(a) of the Federal Rules of Criminal Procedure.  Accordingly, the

Court must decide Mr. Newmark's Rule 29(a) Motion on the basis of the evidence submitted by

the Government after it concluded its direct case.

   Mr. Newmark raises several arguments in support of his motion.  First, Mr. Newmark

argues that a judgment of acquittal must be entered as to Counts One and Three because the

evidence offered by the Government was insufficient to prove that Mr. Newmark "devised" or

"participated" in a "scheme" to defraud the Walkers.  Specifically, Mr. Newmark argues that

proof that he misled Morgan Stanley is not equivalent to proof that he defrauded the Walkers.

Secondly, with respect to Count Three, Mr. Newmark argues that the Government produced

insufficient evidence that the subject mailing was "in furtherance" of the charged scheme to

defraud the Walkers.  Third, with respect to Count Five, Mr. Newmark argues that Chris Zeyer's

testimony is insufficient to prove that Mr. Newmark made a false declaration under oath, that the

Government produced insufficient proof that his false statement was "material," and that the

deposition questions and answers at issue are too ambiguous to form the basis of a false

declaration charge.  Finally, as to Counts One, Three and Five, Mr. Newmark argues that the

Indictment charged him with selling the Walkers a "tax-deferred annuity," while the annuity he

actually sold them was a "charitable gift annuity," and, hence, Mr. Newmark argues that this

12

amounts to an impermissible constructive amendment or a variance of the Indictment.

For the reasons discussed below, Mr. Newmark's Rule 29(a) Motion will be granted in part and denied in part, in that a judgment of acquittal will be entered for Mr. Newmark as to Counts Three and Five of the Indictment.  Mr. Newmark's Rule 29(a) Motion will be denied in all other respects.  In addition, Mr. Newmark's renewed Rule 29 motions, which require the Court to consider all evidence presented at the end of the entire case, will be denied.

**B.     Counts One and Three – Sufficiency of the Evidence of a "Scheme" to Defraud the Walkers**

Count One of the Indictment charges Mr. Newmark with one count of wire fraud based on an August 31, 2001 facsimile transmission from Mr. Newmark to Morgan Stanley, and Count Three charges one count of mail fraud based on Mr. Newmark's December 16, 2003 mailing of his allegedly false answers to interrogatories in the subsequent civil suit initiated against him by the Walkers.  The Indictment describes, in part, the scheme that supports the wire and mail fraud counts as follows:

> Defendant **BRIAN J. NEWMARK** designed and implemented, and defendant **JOHN J. WIGHT** implemented, various sales techniques and devices, including oral presentations, documents, letters and business cards, for the purpose of fostering the false impression that defendants were attorneys, or in the employ of an attorney, in order to gain the trust of [the Walkers] and to sell them tax deferred annuities.

(Indictment at 2 ¶ 8.B.)

Conviction on a mail or wire fraud charge requires proof that the defendant "devised or intended to devise" a scheme to defraud.  See 18 U.S.C. §§ 1341,[9] 1343.[10]  The substantive

_____

[9] The mail fraud statute, 18 U.S.C. § 1341, provides:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses,

elements of mail fraud under 18 U.S.C. § 1341 and wire fraud under § 1343 are: (1) the existence

of a scheme to defraud; (2) (a) the use of the mails, whether the United States Postal Service or a

private carrier, or (b) the use of interstate wire facilities, "for the purpose of executing" the

fraudulent scheme; and (3) culpable participation by the defendant, that is, participation by the

defendant with specific intent to defraud.  See United States v. Dobson, 419 F.3d 231, 236-37

(3d Cir. 2005) (citing United States v. Copple, 24 F.3d 535, 544 (3d Cir. 1994); United States v.

Pearlstein, 576 F.2d 531, 534 (3d Cir. 1978)).  Therefore, Mr. Newmark's motion must be denied

if the Court determines that the Government produced "substantial evidence" that Mr. Newmark

either knowingly devised or participated in the charged scheme, and had the specific intent to

representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation affects a financial institution, such person shall be fined not more than $ 1,000,000 or imprisoned not more than 30 years, or both.

[10] The wire fraud statute, 18 U.S.C. § 1343, provides:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation affects a financial institution, such person shall be fined not more than $ 1,000,000 or imprisoned not more than 30 years, or both.

defraud the Walkers.

Mr. Newmark argues that the Government did not produce sufficient evidence to prove his culpable participation in the charged scheme to defraud the Walkers. Tacitly acknowledging that the Newmark-Morgan Stanley communications are at least problematic for his position, Mr. Newmark argues that proof that he misrepresented himself to Morgan Stanley is not equivalent to proof that he defrauded the Walkers.

As an initial, not insignificant, matter, the Court notes that it is undisputed that Mr. Newmark had no direct contact with either Thomas or Arthur Walker. The Government did not produce any evidence indicating that Mr. Newmark was ever in the physical presence of either of the Walkers during the time frame of the alleged scheme, or that Mr. Newmark ever communicated directly with either of the Walkers, either in person, over the telephone, or in any other manner. No evidence was presented that Mr. Newmark misrepresented himself to the Walkers as an attorney in order to sell annuities to them. Instead, at trial the Government relied on a two-pronged theory implicating Mr. Newmark's "culpable participation" in the charged scheme to defraud the Walkers. First, the Government argued that Mr. Newmark "devised" the scheme that was carried out by Ms. Lawson, Mr. Wight and others. Secondly, the Government argued that Mr. Newmark's own actions, specifically, his interactions with Morgan Stanley, support the finding that he "participated" in the scheme to defraud the Walkers.

Based on the evidence presented, the Government's theory is that Mr. Newmark "devised" an alleged scheme whereby employees of his various companies, including Mr. Wight, would approach elderly target victims and attempt to sell them estate planning products and services (which would be procured through attorney Barry Bohmueller) as well as high-priced

15

insurance products (the sales of which would be brokered by Mr. Newmark or Mr. Wight) by

falsely misrepresenting themselves or himself as an attorney.  To pursue that theory, the

Government presented the following evidence at trial:

- Thomas Walker testified that neither Ms. Lawson nor Mr. Wight ever identified themselves to the Walkers, in documents or otherwise, as employees of BEN Consulting, EPA, or FFS.[11]  Thomas Walker testified that Victoria Larson told the Walkers that she worked for Barry Bohmueller.  (Trial Tr. vol. 2, 120:15-16, Oct. 16, 2007.)  In addition, Mr. Walker testified that during an unspecified meeting with Mr. Wight, Mr. Wight told Thomas and Arthur Walker that he (Mr. Wight) was an attorney.  (Trial Tr. vol. 2, 129:12-16, Oct. 16, 2007.)

- The Government presented numerous documents that the Walkers signed on June 27, 2001 during Ms. Larson's visit, including an engagement letter, and a statement confirming that Mr. Bohmueller's office would prepare certain estate planning documents for the Walkers.  These documents either displayed Mr. Bohmueller's letterhead or included his name, and the engagement letter included Mr. Bohmueller's typed facsimile signature.  None of these documents contained or referenced Mr. Newmark's name, or the name of any of the companies he operated.  (Gov't Trial Exs. 2-3, 5-6, 7A-B, 8A-B.)

- The Government also presented checks that each of the Walker brothers had signed, dated

---

[11] Mr. Wight disputed this contention when he testified during the defense case.  Mr. Wight testified that prior to meeting the Walkers for the first time, he called them to arrange his delivery of the estate planning documents.  (Trial Tr. vol. 5, 13:13-20, Oct. 19, 2007)  He stated that he first spoke to Arthur Walker, and informed him that he was a notary for Mr. Bohmueller and was coming to deliver and notarize the Walkers' trusts.  (Trial Tr. vol. 5, 13:23-25, Oct. 19, 2007.)  In addition, Mr. Wight testified that "as an employee of Funding and Financial Services, I was there to do the free financial consultation that they had requested, and to fund their trust."  (Trial Tr. vol. 5, 14:1-3, Oct. 19, 2007.)

Mr. Wight also testified that during his July 20, 2001 meeting with the Walkers, after the Walkers had finished executing the various estate planning documents that Mr. Wight had delivered, he stated "Okay.  We're all clear.  The Bohmueller work is done.  Now I'm wearing the Funding and Financial Services hat."  (Trial Tr. vol. 5, 25:10-13, Oct. 19, 2007.)  In addition, during cross-examination by Mr. Newmark's counsel, Mr. Wight testified that EPA became the successor company to FFS, and that EPA changed offices at some point in 2002.  (Trial Tr. vol. 5, 101:4-6; 101:11-17, Oct. 19, 2007.)  Mr. Wight testified that following EPA's move, it sent a letter to all of its clients informing them of the change of address.  (Trial Tr. vol. 5, 101:18-21; 102:4-6, Oct. 19, 2007.)  Counsel pointed to a letter from EPA addressed to Mr. Arthur Walker, dated September 27, 2002, notifying him of the change of address and enclosing two EPA business cards.  (Trial Tr. vol. 5, 102:13-103:3, Oct. 19, 2007.)

June 27, 2001, made out to "Bohmueller Law Office" in the amount of $1650.00.[12]
(Gov't Trial Exs. 4A-B.)  The Walkers gave these checks to Ms. Larson on that date.

•      Two of the Walkers' neighbors – Murray and Gertrude Fisk – testified that on June 20, 2001, they witnessed the Walkers' signing various estate planning documents that Mr. Wight had delivered to the Walker home.  (Trial Tr. vol. 2, 47:17-49:23; 81:21-82:9, Oct. 16, 2007.)  The Fisks testified that on that day, in Mr. Wight's presence, one of the Walkers introduced Mr. Wight as their attorney.  (Trial Tr. vol. 2, 47:17-49:23; 81:21-23; 95:8-9, 20-21, Oct. 16, 2007.)  At that time, Mr. Wight did not correct that misstatement.  (Gov't Trial Ex. 123, J. Wight Dep. Excerpt No. 26 at 1-2, Jan. 20, 2004.)

•      During one of Mr. Wight's visits to the Walkers' home, Mr. Wight gave the Walkers a business card from attorney Barry Bohmueller's office.  Mr. Wight had written his name and telephone number on the front of the card.  (Gov't Trial Ex. 1; Trial Tr. vol. 2, 128:7-11, Oct. 16, 2007.)[13]

--------

[12] The defense notes that on June 27, 2001 both Walkers also signed a "Consultation Request Form," in which the Walkers ostensibly requested Mr. Bohmueller to arrange a "free, no-obligation consultation with a financial services representative who is also a licensed insurance agent."  (Gov't Trial Ex. 9A.)  This form stated that the requested "consultation" would occur "[a]t the time of delivery of your Personal Estate Planning Package."  (Gov't Trial Ex. 9A.)

[13] During trial, the Government's counsel questioned Thomas Walker about this Bohmueller business card on which John Wight had written his name and telephone number.  (See generally Trial Tr. vol. 2, 128:7-11, Oct. 16, 2007.)  Counsel's questions were asked in the context of Mr. Wight's initial visit to the Walkers' home, implying that Mr. Wight had given this card to the Walkers upon first meeting them.  However, Mr. Walker never testified as to when Mr. Wight actually gave the Bohmueller business card to him and his brother, or even that Mr. Wight gave it to them during his first visit to the Walkers' home.  Mr. Walker testified simply that Mr. Wight had given them the Bohmueller business card.

In fact, the deposition excerpts that Mr. Lightman read to the jury included a statement by Mr. Wight that he did not give the Bohmueller business card to the Walkers during one of the initial meetings, (Gov't Trial Ex. 123, J. Wight Dep. Excerpt No. 27 at 1), or prior to his first meeting with the Walkers on July 20, 2001, on which date the Fisks witnessed the Walkers sign their trust documents.  (Gov't Trial Ex. 123, J. Wight Dep. Excerpt No. 26 at 2.)  Mr. Wight later admitted that he had written his name and telephone number on the Bohmueller business card, but explained in detail that he done this after the Walkers had received their trust documents back from Morgan Stanley.  (Gov't Trial Ex. 123, J. Wight Dep. Excerpt No. 27 at 1-2.)  Morgan Stanley's Perry Rose had taken the Walkers' trust books with him when he left the Walkers' home on or around August 21, 2001, and had returned the trust books to the Walkers at a later date.  During his deposition, Mr. Wight stated that when Morgan Stanley returned the trust books to the Walkers, Mr. Bohmueller's business card was not included in the inside front pocket,

- The Government presented four "Tax Deductible Annuity Application and Agreements" that the Walkers had executed on August 3, 2001. (Gov't Trial Exs. 13-14, 17-18.) These agreements were also signed by Mr. Newmark on August 3, 2001, and by a representative of NCF on August 13, 2001. By signing these agreements, Mr. Newmark certified that he witnessed the Walkers sign the agreements in his presence. However, it is undisputed that Mr. Newmark never met the Walkers during the pendency of the annuity transactions, so he could not have, in fact, witnessed the Walkers's signatures as his signature certifies.

As evidence of Mr. Newmark's supposed direct involvement in the scheme, the

Government also introduced the following evidence:

- Two undated letters, nominally from Arthur and Thomas Walker, respectively, but actually drafted and sent by Mr. Newmark, to Morgan Stanley's Scranton branch office complaining about Perry Rose's visit to the Walkers' home. (Gov't Trial Ex. 90 at 5, 7.)

- Two letters, dated August 29, 2001, again, nominally from Arthur and Thomas Walker, respectively, but actually drafted and sent by Mr. Newmark to Morgan Stanley's legal department authorizing and instructing Morgan Stanley to effectuate the transfer of the Walkers' funds to New Life. (Gov't Trial Ex. 90 at 4, 6.)

- A fax, dated August 30, 2001, nominally from the Walkers but, again, actually drafted and sent by Mr. Newmark, to Phillip J. Purcell, Morgan Stanley's Chief Executive Officer. This letter reads that "our attorney's office" had contacted Morgan Stanley regarding Morgan Stanley's delay in transferring the Walkers' funds to New Life. (Gov't Trial Ex. 90 at 3.)

- Mr. Zeyer's testimony that Mr. Newmark called Morgan Stanley's compliance department on August 31, 2001, to complain that Morgan Stanley was delaying the transfer of the Walkers' funds to New Life. (See generally Trial Tr. C. Zeyer, Oct. 17,

---

where it was supposed to be. Mr. Wight stated that he "replaced the [Bohmueller business] cards and as further assurance that [the Walkers] would always be able to call me should there be any incident further with Morgan Stanley with respect to these trust books I was referring to, I put my name in big block letters and my 800 phone number." (Gov't Trial Ex. 123, J. Wight Dep. Excerpt No. 27 at 1.)

Therefore, the only evidence produced at trial tending to prove when Mr. Wight gave this business card to the Walkers is Mr. Wight's testimony that this event occurred weeks after the Walkers had executed the trusts and wills prepared by Mr. Bohmueller, and after they had already decided to purchase the New Life annuities and executed four purchase contracts towards that end.

2007.)[14]

- The "verbal complaint form" that Mr. Zeyer completed after speaking with Mr. Newmark over the telephone on August 31, 2001. On the form, Mr. Zeyer identified Mr. Newmark as "Attorney for Arthur and Thomas Walker," and referred to Mr. Newmark multiple times as "Attorney." (Gov't Trial Ex. 90 at 2.)

- A facsimile cover sheet, dated August 31, 2001, from Mr. Newmark to Mr. Zeyer at Morgan Stanley. The facsimile cover sheet purported to be from the "Bohmueller Law Offices" (those words were typed in large print on the top of the page). However, the cover sheet listed Mr. Newmark's telephone and fax numbers on the bottom of the page. In the "notes/comments" section of the facsimile cover sheet, Mr. Newmark had written some text to Mr. Zeyer and at the bottom of the cover sheet he typed his full name. (Gov't Trial Ex. 91.)

- Excerpts from Mr. Newmark's deposition in the civil suit, where Mr. Newmark testified that he "made up" the August 31, 2001 facsimile cover sheet. (Gov't Trial Ex. 123, B. Newmark Dep. Excerpt No. 22 at 4, Jan. 21, 2004.)

Certainly, this evidence is susceptible to competing inferences. On one hand, the evidence permits the inference that Mr. Newmark devised a business plan that, perhaps sleazy, appears to be legal. Following this inference, Mr. Newmark and his associates devised a plan to piggy-back sales of insurance products on estate planning services provided by attorney Bohmueller. Mr. Newmark actively marketed these services to individuals over 60 years' old with some financial means. Mr. Newmark's employees would advertise and market Mr. Bohmueller's products in order to meet and gain the trust of potential customers. During this part of the process, Mr. Newmark's employees, such as Mr. Wight, acted as delivery agents for Mr. Bohmueller. Indeed, Mr. Wight would deliver to the customers the various estate planning

---

[14] The Defendants requested an expedited transcript of Mr. Zeyer's testimony at trial, so that they could prepare their Rule 29(a) motions at the close of the Government's case. The court reporter complied and prepared a transcript of Mr. Zeyer's October 17, 2007 trial testimony. Mr. Zeyer's testimony is not included in volume three of the trial transcripts, which includes the remainder of the trial proceedings held on October 17. The volume containing only Mr. Zeyer's testimony is referred to as "Trial Tr. C. Zeyer."

documents drafted by Mr. Bohmuller, and be available to explain the documents to the customers, as well as ensure that they signed them.  Once the customers executed the various estate planning documents, Mr. Wight would remove his "agent-for-Mr. Bohmueller hat" and put on his "insurance salesman hat."  Thereafter, Mr. Wight, in his role as an insurance agent, would attempt to sell insurance products to the customers who had just purchased estate planning services.  In order to ensure at least the appearance that customers understood Mr. Wight's dual role, customers, like the Walkers, would sign several documents confirming that they understood the difference between the estate planning services offered by Mr. Bohmueller, and the financial consultation offered by Mr. Wight.  Absent any overt misrepresentations, this "business plan" does not appear to be fraudulent.

On the other hand, the evidence also permits the inference that Mr. Newmark designed a scheme to confuse and deceive elderly people into believing that Ms. Larson and Mr. Wight were attorneys, or at least actually part, i.e., "in the employ" of Mr. Bohmueller's law practice.  This scheme involved using "made up" letterhead, Mr. Wight's "lies" about being an attorney and generally creating the impression that all of the services were being sanctioned or sponsored, if not actually offered, by a law firm.  Mr. Newmark's employees or agents used the Bohmueller name to get in the door, and once they had gained the confidence of a potential customer, they attempted to sell those customers insurance products.

Thomas Walker testified that he and his brother previously had utilized the services of a lawyer to draft their wills.  It is not unreasonable to expect that the Walkers, or other people, would have expected the person who delivers lengthy, complicated trust documents, and then explains those documents to them and answers their questions for an hour before having them

sign the documents, to be a lawyer.  In this case, Mr. Wight, a non-lawyer, explained complex

legal trust documents to the Walkers, and then attempted to sell them financial products to fund

the very trust that had just been established.

Somewhat less susceptible to competing interpretations, there is substantial evidence that

Mr. Newmark "participated" in the scheme by convincing Morgan Stanley that he was the

Walkers' attorney in order to persuade Morgan Stanley to transfer the Walkers' funds to New

Life to consummate the purchase of the annuities.  This is the second prong of the Government's

theory.  Essentially, the Government argues that Mr. Newmark's duplicitous dealings with

Morgan Stanley are evidence that he actively participated in the scheme to defraud the Walkers,

and secondly, that those activities provide circumstantial evidence that Mr. Newmark devised the

scheme to defraud the Walkers because the misrepresentation at issue – the lie about being an

attorney or in the employ of an attorney – was the same.  In its brief, the Government argues that

"it was no accident that Mr. Wight and Mr. Newmark both lied about being attorneys, but was

instead part of a pre-meditated scheme to defraud" the Walkers.  (Gov't Mem. Opp'n 13.)

Mr. Newmark has a heavy burden as the Court must review the evidence in the light most

favorable to the Government, McKee, 506 F.3d at 232, and must sustain the verdict "'if a rational

trier of fact could have found [the] defendant guilty beyond a reasonable doubt, and the verdict is

supported by substantial evidence.'"  Id. (quoting Coyle, 63 F.3d at 1243.

While the evidence that Mr. Newmark "devised" or "participated" in a scheme to defraud

the Walkers is not overwhelming, the Court concludes that the evidence is sufficiently inter-

connected and substantial that a rational jury could find beyond a reasonable doubt that Mr.

Newmark participated in a scheme to defraud the Walkers.  Certainly, the Government produced

little evidence that provides any nexus between Mr. Newmark and "the scheme" up to the point

in time of when Mr. Newmark's various and varied direct and indirect (e.g., the ghost-written

documents "from" the Walkers) contacts with Morgan Stanley came to the fore.  However, Mr.

Newmark's direct and personal participation and methodology in attempting to persuade Morgan

Stanley to transfer the Walkers' funds to New Life is without question.  Of course, the defense

disputes that Mr. Newmark actually affirmatively misrepresented himself as an attorney for the

Walkers during his August 31, 2001 telephone conversation with Mr. Zeyer, but cannot muster

any similar contest as to the documentary evidence.  Moreover, the fact that Mr. Newmark played

a key role in persuading Morgan Stanley to transfer the Walkers' funds to New Life is

incontrovertible.

　　　　When Perry Rose arrived at the Walkers' home in Tunkhannock, and the New Life

annuity transactions appeared to be jeopardized, Mr. Newmark sprung into action in order to save

the transactions (and his potential commission).  He dispatched Mr. Wight to the Walkers' home

along with a portable fax machine, and "ghostwrote" numerous letters to various people at

Morgan Stanley, which the Walkers signed.  These letters complained about Morgan Stanley's

representatives' "harassment" and threatened to take action if Morgan Stanley attempted to

contact the Walkers again.[15]  Mr. Newmark also sent a fax to Morgan Stanley's CEO, nominally

from the Walkers, falsely stating that the Walkers "attorney's office" had complained to Morgan

---

[15] One pair of letters, addressed to Morgan Stanley's compliance department, states that if
the Walkers are contacted by any other representatives of Morgan Stanley, the Walkers will
"contact the [National Association of Securities Dealers] and the [U.S. Securities and Exchange
Commission]."  (Gov't Trial Ex. 90 at 5,7.)  These letters further state: "Please take this letter
seriously, I will not hesitate to take further actions if I am contacted again."  (Gov't Trial Ex. 90
at 5,7.)

Stanley about its delaying the transfer of the Walkers' funds.  When these actions still failed to force Morgan Stanley to transfer the Walkers' funds to New Life, Mr. Newmark called Morgan Stanley directly, and sent Morgan Stanley correspondence under false pretenses, namely, the fax cover sheet bearing the name "Bohmueller Law Offices," which Mr. Newmark admitted he had "made up."

A rational jury could conclude, based on the evidence that Mr. Newmark "foster[ed] the false impression" that he was an attorney, and that Mr. Newmark's actions were part of a larger scheme to defraud the Walkers.  Therefore, at the Rule 29(a) stage, considering Mr. Newmark's motion on the basis of the evidence that had been presented when the Government rested its case-in-chief, Mr. Newmark's motion on these grounds will be denied.[16]

The Court will also deny Mr. Newmark's renewed Rule 29 challenge to Count One considering all evidence presented at the close of the entire case, and after the jury reached its verdict.  The evidence presented by the defense had very little bearing on Mr. Newmark's interactions with Morgan Stanley, which, as discussed above, was a major component of the Government's case on this Count.

At trial, Mr. Wight testified at length about his interactions with the Walkers and with

---

[16] However, as the Court will explain below, while the Court finds the Government's proof that Mr. Newmark participated in a "scheme" to defraud the Walkers to be sufficient, the Court also finds that Mr. Newmark's  December 16, 2003 mailing of answers to interrogatories two and a half years later was not "in furtherance" of that scheme.  A component of the Court's ruling on Count Three is that the Government's evidence was insufficient to prove that Mr. Newmark's December 16, 2003 mailing was incident to the rest of the charged scheme, which appeared to conclude in late 2001 after the Walkers purchased the New Life annuities.  A judgment of acquittal will be entered for Mr. Newmark as to Count Three on that basis.  For purposes of Count One, however, for the reasons provided above, the Court finds that the Government produced sufficient evidence upon which the jury could have found Mr. Newmark guilty of the wire fraud charge.

Mr. Newmark.  Mr. Wight testified that prior to meeting the Walkers, he had never sold a

charitable gift annuity to any other client.  (Oct. 19, 2007 Trial Tr. 10:19-21.)  He testified that

after he had gained an understanding of the Walkers' estate planning objectives, and understood

that the Walkers wanted to give away their entire estate, he discussed the Walkers' investment

options with Mr. Newmark on numerous occasions.  He testified that Mr. Newmark "did an

awful lot of research" regarding the Walkers' investment options, and that Mr. Newmark

suggested selling the Walkers a New Life charitable gift annuity.  This evidence tends to show

that Mr. Newmark was intricately involved with the decision-making process that ultimately led

to the Walkers' parting with approximately $3.5 million.  Mr. Newmark chose the particular

investment vehicle, made all the arrangements with New Life, and prepared some of the

paperwork that was necessary to purchase the annuities.[17]  Moreover, Mr. Newmark was

involved in the decision to recommend that the Walkers make an enormous charitable donation,

and that they spend all of their liquid assets, a sum exceeding $3.5 million, to purchase those

annuities.[18]  Mr. Wight's testimony, plus all of the evidence produced by the Government that is

discussed above, is sufficient to sustain the jury's guilty verdict with respect to Count One.

---

[17] The cover sheet of certain paperwork accompanying the Tax Deductible Annuity
Application and Agreements that the Walkers signed, which illustrates the mechanics of the
charitable gift annuities that the Walkers purchased, reads: "A Service Provided By, Brian
Newmark, National Community Foundation," and lists NCF's Bentwood, TN address.  (Gov't
Trial Exs. 13-14, 17-18.)

[18] As the Government's expert testified at trial, it is exceedingly rare for individuals in
their 80's to purchase such expensive annuities because those individuals likely will not receive
the full benefit of a continuous, monthly income stream for a set period of time into the future,
which is a primary benefit of purchasing an annuity.  (Trial Tr. vol. 4, 126:15-127:16, Oct. 18.
2007.)

### C.    Count Three – Whether the Mailing was "In Furtherance" of a "Scheme to Defraud" the Walkers

The Indictment charged Mr. Newmark with one count of mail fraud based on the December 16, 2003 mailing, through his attorney, of answers to interrogatories in civil litigation initiated by the Walkers against Mr. Newmark and others two years after the Walkers purchased the annuities from New Life.  The Indictment describes the "scheme" as follows:

> From on or about June 27, 2001 through on or about January 21, 2004, defendants **BRIAN J. NEWMARK and JOHN N. WIGHT** knowingly devised and intended to devise a scheme to defraud [the Walkers], and to obtain money and property from [the Walkers] by means of false and fraudulent pretenses, representations and promises.

(Indictment at 2 ¶ 7.)  The "money and property" in question was approximately $3.5 million that the Walkers were persuaded to invest in charitable gift annuities.  The Walkers purchased these annuities from New Life Corporation.  The "fraudulent misrepresentation" charged was that Mr. Newmark, Mr. Wight and others falsely held themselves out as attorneys for the Walkers.

The Indictment further alleges that as "part of the scheme,"

> During litigation in federal court in the Eastern District of Pennsylvania with [the Walkers] arising from the events charged here, defendant **BRIAN J. NEWMARK** falsely denied holding himself out as an attorney for [the Walkers], in response to Plaintiff's First Set of Interrogatories, served by mail on December 16, 2003.

(Indictment at 4 ¶ 8.K.)  The Indictment charges that on December 16, 2003, Mr. Newmark mailed these answers to interrogatories "for the purpose of executing" the scheme described in the Indictment.  (Indictment at 6 ¶ 2.)

Mr.  Newmark argues that this December 16, 2003 mailing of the interrogatory answers was not made, as a matter of law, "for the purpose of executing," or "in furtherance" of, the alleged scheme.  To evaluate this argument the Court must consider what is the reasonable or

25

realistic "life" of the "scheme."  The trial evidence of the chronology in this case was essentially not disputed.  The Walkers invested in the New Life annuities in late 2001, and Mr. Newmark and Mr. Wight received their commissions resulting from those transactions during that same time period.  Mr. Wight made several follow-up visits to the Walkers' Pennsylvania and Florida homes during 2002, related to servicing the annuities, i.e., ensuring that the Walkers received a regular, monthly stream of payments.  The Government did not offer any evidence, through testimony or otherwise, that Mr. Wight (or anyone else employed by or associated with Mr. Newmark) or Mr. Newmark himself attempted to sell any other financial products to the Walkers after the initial annuity transactions were completed in the fall of 2001.

The Walkers initiated their civil suit against Mr. Newmark and others in June 2003.  Six months later, on December 16, 2003, after discovery in the civil action had commenced, Mr. Newmark's attorney mailed the interrogatory answers in question.  Mr. Newmark argues that this mailing, which occurred more than two years after the object of a scheme, i.e., the late 2001 consummation of the annuity transactions, had been accomplished, was not "for the purpose of executing" the scheme.

1.    *The Mail Fraud Statute*

In order to prove mail fraud under 18 U.S.C. § 1341, the Government needed to prove that Mr. Newmark devised or participated in a scheme to defraud and that the mailings charged in the Indictment were made "for the purpose of executing such scheme."  18 U.S.C. § 1341; Parr v. United States, 363 U.S. 370, 385 (1960).  As a general matter, the Supreme Court stated that "[t]he federal mail fraud statute does not purport to reach all frauds, but only those limited instances in which the use of the mails is a part of the execution of the fraud, leaving all other

26

cases to be dealt with by appropriate state law." <u>Kann v. United States</u>, 323 U.S. 88, 95 (1944).

Moreover, the mail fraud statute does not reach every mailing that is the by-product of a scheme

to defraud, as it only pertains to mailings "for the purpose of executing" a scheme to obtain

money or property.

The Court of Appeals for the Third Circuit analyzed the phrase "for the purposes of

executing the scheme," in the context of the mail fraud statute as follows:

> Whether a mailing is "for the purpose of executing a scheme" within the meaning of
> § 1341 depends upon whether it is "sufficiently closely related to respondent's
> scheme to bring his conduct within the statute." The completion of the scheme must
> depend in some way on the mailings charged.  However, "[i]t is not necessary that
> the scheme contemplate the use of the mails as an essential element."  Rather, it is
> sufficient if the mailing is "incident to an essential part of the scheme."

<u>United States v. Lebovitz</u>, 669 F.2d 894, 896 (3d Cir. 1982) (citations omitted); <u>accord</u> <u>United</u>

<u>States v. Cross</u>, 128 F.3d 145, 150 (3d Cir. 1997); <u>United States v. Ruuska</u>, 883 F.2d 262, 264

(3d Cir. 1989); <u>United States v. Otto</u>, 742 F.2d 104, 108 (3d Cir. 1984).  "The relevant question

at all times is whether the mailing is part of the execution of the scheme as conceived by the

perpetrator at the time, regardless of whether the mailing later, through hindsight, may prove to

have been counterproductive and return to haunt the perpetrator of the fraud." <u>Schmuck v.</u>

<u>United States</u>, 489 U.S. 705, 715 (1989).

Generally, a mailing sent after the object of a scheme has been accomplished is not

sufficiently closely related to the scheme to support a mail fraud conviction.  <u>Lebovitz</u>, 669 F.2d

at 896.  "However, the object of a scheme is not necessarily accomplished at the moment when

the perpetrator of the scheme receives the fruits of the scheme."  <u>Id.</u>  Subsequent mailings may be

"for the purpose of executing" the scheme if they were, for example, "designed to lull the victims

into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely than if no mailings had taken place." United States v. Lane, 474 U.S. 438, 451-53 (1986) (quoting United States v. Maze, 414 U.S. 395, 403 (1974)); accord Tabas v. Tabas, 47 F.3d 1280, 1295 n.18 (3d Cir. 1995); Kehr Packages, Inc.  v. Fidelcor, Inc., 926 F.2d 1406, 1416 n.3 (3d Cir. 1991)).

In a seminal case, the United States Supreme Court rejected the "automatic rule that a deliberate, planned use of the mails after the victims' money had been obtained can never be 'for the purpose of executing' the defendants' scheme." United States v. Sampson, 371 U.S. 75, 80 (1962).  The defendants in Sampson were employees of a large corporation who purported to be able to help businessmen obtain loans or sell their businesses.  Id. at 77.  As part of the scheme, the defendants would call prospects and urge them by false representations to sign applications asking the defendants to obtain loans or sell their businesses.  The defendant salesmen would urge prospects to remit an "advanced fee," which the defendants converted into cashiers checks, and then deposited in banks.  After the money had been obtained from the victims, the defendants' scheme, as charged in the indictment, called for a "mailing of the accepted application together with a form letter to the victims 'for the purpose of lulling said victims by representing that their applications had been accepted and that the defendants would therefore perform for said victims" the agreed-upon services.  Id. at 78.

The mailing at issue in Sampson was akin to a receipt or confirmation of payment from the victims.  The district court had dismissed the indictment reasoning that because the mailings came after the money had already been obtained from the victims, the mailings could not have been "for the purpose of executing" the scheme.  Id. at 79.  The Supreme Court disagreed and

reversed.  Because the case was decided in the context of a motion to dismiss an indictment, the

Supreme Court examined only the indictment itself.  The Supreme Court noted that the

indictment alleged that the scheme, as devised by the defendants and as actually carried out,

involved acts both before and after the money changed hands.  Furthermore, the indictment

specifically alleged that the acceptance letters were mailed to the victims "for the purpose of

lulling them by assurances that the promised services would be performed."  Id. at 81.

The Supreme Court distinguished its previous cases, namely, Kann v. United States, 323

U.S. 88, 95 (1944), and Parr v. United States, 363 U.S. 370 (1960),[19] which involved schemes

that "had been fully executed before the mails were used," Sampson, 371 U.S. at 80, such that

the mailing at issue was not "for the purpose of executing" the scheme.  By contrast, the scheme

in Sampson "contemplated from the start the commission of fraudulent activities which were to

be and actually were carried out both before and after the money was obtained from the victims."

Id.  The Supreme Court refused to foreclose the possibility that evidence at trial could prove that

premeditated acts committed after the victims relinquished their money could be "for the purpose

---

[19] In Kann, the defendants fraudulently obtained checks payable to them from their employer, which they then cashed or deposited at a bank.  The use of the mails as charged was the mailing of the checks for collection by the banks that cashed them from the banks upon which they were drawn.  The Supreme Court held that these mailings were not "in furtherance" of the scheme.  Because the defendants had already obtained the money and their scheme had come to fruition before the mailings occurred, the Supreme Court held that the mailings were immaterial to the consummation of the defendants' scheme; the checks were mailed for the banks' own purposes and not in any way for furthering the scheme.

In Parr, the defendants obtained gasoline and other products for themselves using a credit card of a school district which had authorized use of the card for the district's purposes only.  The mailings at issue were two invoices mailed by an oil company to the school district, and the check mailed back in payment.  Again, the Supreme Court found that the mailings – by "outsiders" – were not an integral part of the scheme as planned and executed by the defendants, and that it was completely immaterial to the defendants how the oil company collected on its bill.

of executing" the scheme.

In Sampson, the Supreme Court did not explain why using the mails to "lull" victims after the victims had already parted with their money was "for the purpose of executing" a scheme to obtain that money.  Nor did the Court state when, under such circumstances, the scheme would be fully executed so that subsequent uses of the mails would no longer be "for the purpose of executing" a scheme.  The Supreme Court appeared to find it important that the mailings were intended to "make the victims believe that the defendants had faithfully performed and would continue to perform the promised services."  Id. at 78.

In subsequent cases, the Supreme Court has expounded upon the rationale underlying the "lulling" theory of liability under the mail fraud statute.  In Maze, the Supreme Court focused on whether the mailing at issue was integral to the success of the defendant's scheme.  The defendant stole his roommate's credit card and used it to pay for food and several motel rooms, signing his roommate's name upon checking out of each motel.  The mailings at issue concerned invoices representing the goods and services furnished to the defendant, which each of the motels mailed to the bank that issued the credit card.  The indictment charged the defendant with a scheme to defraud the bank, the roommate, and the several motels, by unlawfully obtaining possession of the credit card, and using the card to purchase the products and services.  The indictment charged that the defendant knew that each merchant would cause the sales slip of the purchases to be delivered by mail to the issuer bank which would in turn mail them to the roommate for payment, Maze, 414 U.S. at 396-97, and knew that the delay in this mailing would enable the defendant to continue purchasing goods and services for an appreciable period of time, id. at 397.

30

The Court held that the scheme in <u>Maze</u> came to fruition when the defendant checked out of each motel.  Therefore, each of the mailings, all of which occurred <u>after</u> the defendant had engaged in each fraudulent transaction, were not "in furtherance" of the scheme.  The Supreme Court stated that "there is no indication that the success of [the defendant's] scheme depended in any way on which of his victims bore the loss," noting that the motel proprietors, the issuing bank, and the roommate were all victims "to a greater or lesser degree."  <u>Id.</u> at 402.  Thus, the hotel proprietors' respective mailings after the defendant checked out of each hotel were immaterial to the success of the scheme, and were, therefore, not "in furtherance" of the scheme.[20]

---

[20] In <u>Schmuck</u>, the Supreme Court again focused on whether the mailing was integral to the success of the scheme. 489 U.S. at 712.  The defendant in <u>Schmuck</u> was charged with devising and executing a "fairly large-scale" scheme to defraud Wisconsin retail automobile customers who based their decisions to purchase certain automobiles at least in part on the low-mileage readings on the tampered odometers.  <u>Id.</u> at 711.  Schmuck, the defendant, employed a man who turned back the odometers on approximately 150 different cars, and Schmuck then marketed the cars to a number of dealers, several of whom he regularly dealt with over a 15-year period.  <u>Id.</u>  To complete the resale of each automobile, the dealer who purchased it from Schmuck would submit a title-application form to the Wisconsin Department of Transportation on behalf of his retail customer.  <u>Id.</u> at 707.  The receipt of a Wisconsin title was a prerequisite for completing the resale; without it, the dealer could not transfer title to the customer and the customer could not obtain Wisconsin tags.  <u>Id.</u>  The submission of the title-application form supplied the mailing element of each of the alleged mail frauds.  <u>Id.</u>

The Supreme Court noted that Schmuck's scheme "was not a 'one-shot' operation in which he sold a single car to an isolated dealer."  <u>Id.</u> at 711.  Instead, it was "an ongoing fraudulent venture," from which "[a] rational jury could have concluded that the success of Schmuck's venture depended upon his continued harmonious relations with, and good reputation among, retail dealers, which in turn required the smooth flow of cars from the dealers to their Wisconsin customers."  <u>Id.</u> at 711-12.  The Court upheld the mail fraud convictions.  It acknowledged that "although the registration-form mailings may not have contributed directly to the duping of either the retail dealers or the customers, they were necessary to the passage of title, which in turn was essential to the perpetuation of Schmuck's scheme."  <u>Id.</u> at 712.  In so holding, the Supreme Court affirmed its earlier rulings that even "innocent" mailings, i.e., ones that contain no false information, may support a mail fraud conviction.  <u>Id.</u> at 714-15 (<u>citing</u> <u>Parr</u>, 363 U.S. at 390).

The Maze Court rejected the Government's arguments in reliance upon Sampson, that the delay caused by the use of the mails was essential to the success of the "scheme" in that it aided the perpetrator and postponed detection.  Id. at 402.[21]  The Supreme Court distinguished Sampson, reiterating that in Sampson the mailings were designed to "lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely than if no mailings had taken place."  Id. at 403.  By contrast, the successful completion of the mailings in Maze would have increased the probability that the defendant would be detected and apprehended.  Id.

The Third Circuit Court of Appeals also has had ample opportunity to analyze the phrase "for the purpose of executing the scheme" in the mail fraud context.  In Lebovitz, the court of appeals affirmed a mail fraud conviction where Lebovitz, an attorney, initiated litigation and presented false claims on behalf of his clients for medical payments and personal injuries resulting from an auto accident.  After a jury convicted him, Lebovitz challenged his mail fraud convictions with respect to three mailings related to third-party claims asserted by the original defendants to the lawsuit initiated by Lebovitz's clients.  Lebovitz argued that the joinder of, and recovery of money from, an additional defendant was not part of the "scheme," which, he argued, only involved defrauding the "original" defendants, and that the subject mailings lacked a sufficient nexus to the scheme to bring them within the ambit of the mail fraud statute.  The court of appeals disagreed, finding that the mailings at issue were sufficiently related to the alleged scheme to support a conviction for mail fraud.  Lebovitz, 669 F.2d at 899.  The court noted that

---

[21] The Supreme Court also noted that the delay was not "caused by" the use of the mails, but was caused by the distance between the sender of the mail and the recipient, in addition to the billing system of the issuing bank.  Maze, 414 U.S. at 403 & n.8.

Lebovitz had negotiated and processed the settlement of the "original" claims with the third-party claims at the same time, and that during settlement negotiations Lebovitz asserted damages claims based on the same inflated bills at issue in the "original" claims.[22]

By contrast, in United States v. Tarnopol, 561 F.2d 466, 472 (3d Cir. 1977), the court of appeals reversed defendants' conviction for mail fraud, holding that "routine business" mailings that took place after the object of the scheme had been accomplished were not sufficiently closely related to the scheme to support a mail fraud prosecution.  The defendants were executives of certain record companies, and the "scheme" involved sales of records, which the record companies did not record on their books.  The defendants used the proceeds of the sales to make improper payments to third parties, such as disc jockeys and program directors of radio stations, to secure favored treatment of the defendants' companies' recordings.  In addition, the government argued that the defendants used these unrecorded transactions to defraud the United

---

[22] Lebovitz had challenged an additional mailing related to a separate accident.  Lebovitz represented a driver and a passenger in the accident in an action against another driver. Lebovitz's clients were insured by Nationwide, and Lebovitz sought recovery from Nationwide for his clients' medical expenses based on fraudulently inflated medical bills.  The medical payment claim was paid on December 16, 1974.

Lebovitz represented the same clients in a personal injury suit, and in that suit, the defendant asserted third-party claims against one of Lebovitz's clients.  Nationwide, not Lebovitz, defended those claims.  The mailing at issue was an August 18, 1976 letter from Nationwide's trial attorney to Nationwide's claims attorney enclosing, among other things, the fraudulently inflated medical bills.  The court of appeals sustained the conviction in this count as well.  Rejecting Lebovitz's argument that the "scheme" concluded when he received payment in December 1974, the court noted that Lebovitz continued to represent these clients when the letter at issue was sent, and their personal injury claims relied in part upon the fraudulently inflated medical bills.  The court pointed to Lebovitz's own testimony, and a letter he sent to Nationwide in October 1977, showing that he was still attempting to get Nationwide to pay more money to his clients well into 1977.  The court held that it could not state, as a matter of law, that the August 1976 mailing was not incident to an essential part of the scheme, which the jury could have viewed as a settlement of all of the claims of Lebovitz's clients.  Lebovitz, 699 F.2d at 899.

States for tax purposes. The mailings at issue were packing slips mailed by the shipping company to the recipient (defendant) companies listing the records shipped at the direction of the recipient companies. The court noted that this was a routine business procedure that was followed in the case of all sales, whether or not they were involved in the scheme to defraud. Id. at 472. The court held that these mailings were too remote from the scheme to be regarded as furthering it. The mailings occurred before the first action was taken to execute the fraud, were initiated by the shipping company – not the defendants' companies – and were "perfectly proper routine procedure in aid of the conduct of business" between the shipping company and the defendants' companies. Id. at 473.

In yet another case, United States v. Otto, 742 F.2d 104 (3d Cir. 1984), the court of appeals again considered the role of mailings vis-à-vis the scheme to defraud. Otto involved a scheme in which the defendant, Otto, induced investors to entrust him with funds to trade in stock options. Otto gave each victim a promissory note for the principal amount plus a guaranteed return on investment. When the notes came due, Otto persuaded the victims to "roll over" the investment into a new one, to invest additional funds, or invest in new opportunities. Otto often used funds received from one investor to cover other investors' notes that had come due. In 1978, several investors demanded payment of monies due and in September one investor, Ging, retained a lawyer to bring suit. Otto contacted Ging and informed him that the business was doing well. In the letter that formed the basis of count one of the indictment, Otto promised to pay Ging monies owed to him on a specific schedule. However, Otto was unable to meet the schedule, and engaged Ging in further negotiations. Ging sent Otto another letter, which formed count five, setting out the terms of a revised settlement agreement. Then, in May 1979, another

investor, Houston, expecting to receive a check from Otto for $30,000, instead received a check for $7,000.  Houston contacted Otto, who advised her not to cash the check.  Nevertheless, Houston attempted to cash the check, and when the bank would not honor it, she sent a letter to Otto requesting that he make the proper arrangements with the bank so that the check would be paid.  This letter formed the basis for count six of the indictment against Otto.

The court of appeals upheld the convictions based on counts one and five, but reversed the conviction as to count six.  The court reasoned that the count one letter was sent while Otto was soliciting and obtaining further investments, and was sent after he became aware that Ging was considering the possibility of a lawsuit.  The court noted that the jury could have found that the first Ging letter "was an attempt to buy time in order to avoid or at least postpone detection.  A lawsuit with its attendant notoriety would alert potential victims to the defendant's duplicity, limit his sources for further funds, and bring the whole scheme crashing down on him."  742 F.2d at 108.  With respect to the second Ging letter (count five), the court found that the letter was an integral part of negotiations, and that the letter may have been a tool to "mollify" the victim.  Id. at 109.  The court found that the jury could have concluded that the mailing was closely related to the first Ging letter and incident to the scheme.  Id.  However, with respect to count six, the court distinguished the Houston letter from the two Ging letters, characterizing it as a "unilateral demand" that Otto honor the $7,000 check.  The Court noted that Otto did not "directly or impliedly invite" the letter, and that its purpose was not to continue a relationship or arrange for a compromise.  Id.  The court analogized this letter to the one in Tarnopol, noting that both letters "tended to threaten the success of the fraudulent scheme rather than to further it."  Id. (citing Tarnopol, 561 F.2d at 473).  The court characterized the two Ging letters as "in the nature of a

35

proposal to arrange a settlement and thus avoid a confrontation," while the Houston letter was a unilateral demand for payment.  "The likely consequences of the two letters are sufficiently different so that Ging's letter can be considered as being in furtherance of the scheme, but the Houston letter fails that test."  Id. at 109.

      2.    *Discussion*

Although there is no "automatic rule that a deliberate, planned use of the mails after the victims' money had been obtained can never be 'for the purpose of executing' the defendants' scheme," Sampson, 371 U.S. at 80, courts have routinely held that "a mailing sent after the object of a scheme has been accomplished is not sufficiently closely related to the scheme to support a mail fraud conviction."  Lebovitz, 669 F.2d at 896.  The one recognized exception to this rule is that "[m]ailings occurring after receipt of the goods obtained by fraud are within the statute," and may be considered to be  "in furtherance" of the scheme, "if they 'were designed to lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely than if no mailings had taken place.'"  United States v. Lane, 474 U.S. 438, 451-52 (1986) (quoting Maze, 414 U.S. at 403). Thus, the Court must deny Mr. Newmark's motion if the Court concludes either that Mr. Newmark's December 16, 2003 mailing of the interrogatory answer was "designed to lull" the Walkers, or that it was sent while the scheme was still ongoing, and was sent to "further" that scheme.  The Court concludes the evidence produced by the Government at trial is insufficient to support either of these options.

Mr. Newmark argues that this case does not involve the classic "check is in the mail" lulling scenario, and relies upon Maze, among other cases, in arguing that he did not use the

mails as a means to induce a false sense of security, postpone victims' ultimate complaint to authorities or delay apprehension.  Maze, 414 U.S. at 403.  While Mr. Newmark acknowledges that Maze posits that this type of "lulling" can occur even after the scheme's fruition and be considered part of the scheme, id., he argues that the mailing in question here was unrelated to any of these objectives.

The Government appears to concede that this case does not present the classic "lulling" scenario.  However, the Government argues that, although the December 16, 2003 mailing was not meant to "lull" the Walkers, it was meant to further the objectives cited in Maze, namely, to make Mr. Newmark's apprehension less likely.  The Government argues that, as in Sampson, the "scheme" devised by Mr. Newmark contemplated from the start the commission of acts after the money changed hands.  The "object" of the scheme, according to the Government, was not merely to "obtain" money from the Walkers but to keep it, and to keep the entire fraudulent enterprise a secret indefinitely.  The Government argues that Mr. Newmark's scheme was not even complete at the time he mailed the interrogatory answers during the litigation because the scheme entailed Mr. Newmark's continued attempts to conceal his fraudulent behavior.  The Government contends that the scheme was still ongoing because at the time the mailing occurred Mr. Newmark "had still not disclosed the existence of his deceit [concerning his false self-representation as an attorney] of Morgan Stanley."  (Gov't Am. Resp. 17.)[23]  Thus, the

_____

[23] The Government argues that the mailing by Mr. Newmark sought to conceal a fraud he believed had not been revealed.  Although the Walkers clearly "detected" a fraud, and sought to remedy that fraud by filing a law suit against Mr. Newmark and others in federal court, at the time Mr. Newmark mailed the answers to interrogatories the Walkers had not then yet discovered Mr. Newmark's precise role in the scheme, namely, that he misrepresented himself to Morgan Stanley as an attorney for the Walkers.  Some of Mr. Newmark's interactions with Morgan Stanley were not discovered until Morgan Stanley produced its records during discovery in the

Government argues that Mr. Newmark's mailing of his answers to interrogatories occurred prior to the accomplishment of the "object" of the scheme.

Neither party brought to the Court's attention, and the Court has not found, any reported case with facts closely resembling the facts presented here, i.e., where a court sustained a conviction for mail fraud based on a mailing of formal discovery responses in a civil lawsuit brought as a result of an alleged fraud.[24]  While the cases cited and discussed above certainly provide the Court with some guidance, they addressed decidedly different factual scenarios.  As the opinions in those cases demonstrate, courts have focused on whether the use of the mails has a sufficient nexus to the object of the scheme such that it was "incident to an essential part of the scheme."  Examples of evidence of the requisite nexus could be the timing of the mailing in relation to the "object" of the scheme, whether multiple victims were involved in a defendant's "ongoing fraudulent venture," whether the perpetrator of the fraud took actions to keep "duping" the victims after he had already obtained the victims' money but before he delivered the

---

civil suit.  Thus, the Government argues that at the time Mr. Newmark mailed his answers to interrogatories, he sought to conceal his role in (and, hence, to perpetrate) the fraud.   The Government argues that the mailing served the purpose of reducing the probability that Mr. Newmark would be "detected and apprehended" by "concealing the true nature of the fraud scheme."  Therefore, according to the Government, as long as Mr. Newmark acted to keep the scheme secret, or conceal his role in the scheme, then he was acting "in furtherance" of the scheme.

[24] The parties cited cases where the charged mailings were sent during the pendency of the lawsuit, see, e.g., Lebovitz, supra, and a case where the court upheld a conviction based on a mailing of interrogatory answers, see United States v. Peters, 732 F.2d 1004 (1st Cir. 1984).  However, these cases involved schemes to defraud insurance companies where the fraud itself was carried out by filing false insurance claims, and filing lawsuits seeking to defraud insurance companies.  In other words, in these cases the lawsuit in which the mailings occurred was the fraudulent vehicle or "scheme" itself, while in this case the alleged scheme was a plan to defraud the Walkers and the lawsuit, i.e., the civil suit brought by the Walkers, was a subsequent by-product of that prior scheme.

promised goods or services, or whether the mailings were otherwise "routine" and unremarkable.

For example, in <u>Sampson</u>, the mailing charged in the indictment occurred within close proximity of the other fraudulent acts comprising the scheme. Once the victims sent their money to the perpetrators of the fraud, those perpetrators immediately sent a letter to the victims to reassure them that the services they purchased would be provided. By contrast, in this case the December 16, 2003 mailing at issue was sent more than two years after the victims parted with their money in late 2001. Moreover, the concept of reassuring or "lulling" the Walkers was not alleged in the Indictment, nor was it proved at trial. The annuity transactions had long since been consummated, the Walkers were receiving monthly annuity payments as promised, and there was no evidence presented that the Walkers' sought any reassurances from the Defendants following the consummation of the transactions. There was evidence presented, mostly through Mr. Wight's testimony during the defense case, that Mr. Wight visited the Walkers a number of times from the fall of 2001 through early 2002 after the annuity transactions had  consummated. Mr. Wight apparently visited the Walkers to ensure that they received the scheduled monthly annuity payments, and that they could access these funds at their local bank. The Court supposes that this behavior could be viewed as "lulling" the Walkers, but even so, Mr. Wight's visits concluded more than a year before the Walkers sued Mr. Newmark and Mr. Wight in June of 2003. Moreover, there was no evidence that anything about these intermittent visits concerned any discussion at all by anyone about whether either or both Messrs. Newmark or Wight were or ever had been attorneys.

In addition, while the civil suit was pending, but before the mailing at issue occurred, Gary Lightman, the Walkers's counsel, already had gone so far as to inform the FBI about Mr.

Newmark's activities and the Walkers' basic contentions about them.[25]  Mr. Newmark's fraud

had already been discovered by the victims, who had been prompted already to start a civil suit

against Mr. Newmark and others, and an FBI investigation was ongoing.[26]  Therefore, there can

---

[25] Here, the Walkers filed a civil lawsuit against Mr. Newmark in June 2003.  On
September 30, 2003, while the civil suit was pending, the Walkers' counsel, Mr. Lightman,
provided the FBI with documents which, as FBI records indicate, "LIGHTMAN felt that the
documents would assist in the [FBI's] present investigation involving" Mr. Newmark, among
others.  (Def. Supp. Br. Ex. G.)  Mr. Newmark argues, therefore, that the mailing of the
interrogatories cannot possibly postpone the Walkers bringing a lawsuit, complaining to the
authorities, or generally make "detection" or "apprehension" less likely given that the civil suit
was well underway and law enforcement authorities were thoroughly engaged in their
investigation of Mr. Newmark.

[26] Mr. Newmark has presented a compelling argument that a victim who has already
discovered the fraud, cannot be "lulled" into a false sense of security by a defendant's
communications intended to either conceal the fraud or even to obstruct an official inquiry.  Mr.
Newmark cites only one case – from the Southern District of New York – in support of this
argument, which, although it is not binding on this Court, is analytically compelling.  In United
States v. Victor Teicher & Co., L.P., 726 F. Supp. 1424, 1434 (S.D.N.Y. 1989), in the wire fraud
context, the court held that a telephone call intended to obstruct an SEC insider trading
investigation once the scheme had come to light was not "in furtherance of" the scheme.  The
scheme concerned an individual's misappropriation of information concerning a certain company
from the Paul Weiss law firm, and the use of that information by defendant Frankel.  The victim
of the scheme was Paul Weiss.  The telephone call that formed the basis for the wire fraud count
was a call by Frankel to an employee of Drexel Burnham Lambert, in which Frankel asked that
employee to destroy a page from Frankel's desk calendar.  That phone call was placed after
Frankel already knew that the SEC was investigating him for insider trading.  The court stated
that "the phone call was not for the purpose of executing the scheme to defraud Paul Weiss, but
rather was an effort to cover up Frankel's participation in that very scheme, a scheme which had
already ended and been discovered by the SEC."  Id.  The court noted that the United States
specifically charged that Frankel "caused the 'destruction of documents relevant to SEC
investigations.'"  Id.  The court cited the "lulling" language in Maze and Schmuck but
distinguished its case, stating that Frankel did not make the phone call to lull Paul Weiss into a
false sense of security or to postpone Paul Weiss's complaint to the authorities as the
"authorities," i.e., the SEC, were already well aware of the scheme and were investigating it at
the time of the telephone call.  Id.  Although the telephone call was, at the time it was made,
intended to defraud the SEC and obstruct its investigation, the court held that the scheme was not
within the reach of the wire fraud statute.  Id.  In Victor Teicher the communication at issue was
meant to obstruct an investigation by the SEC, and was not intended to avoid liability to the
victims in a civil suit.  However, the case serves as a sensible example for application of the

be no serious argument that with the mailing of the discovery answers Mr. Newmark intended to

avoid detection, postpone the Walkers' "ultimate complaint to the authorities" or make his

"apprehension" less likely, considerations that figured prominently in the <u>Sampson</u> and <u>Otto</u>

cases. Mr. Newmark's mailing of false interrogatory answers certainly could be viewed as an

attempt to gain the upper hand in the civil lawsuit brought by the Walkers, or, stated differently,

an attempt to impede or at least mitigate the Walkers' recovery of their money damages.

However, it is too great a leap to view this mailing as having been sent "for the purpose of

executing the scheme" to defraud the Walkers in the first instance.

Furthermore, the evidence presented in this case does not support the Government's

argument that Mr. Newmark's "scheme" was "ongoing" because he sought to conceal his fraud.

Instead, the evidence, viewed in the light most favorable to the Government, supports the

conclusion that Mr. Newmark's "scheme" concluded shortly after the annuity transactions had

been consummated. The Government did not produce sufficient evidence from which a

reasonable jury could conclude that the December 16, 2003 mailing was "part of," "incident to,"

or "in furtherance of" the scheme to obtain money from the Walkers.

The brief description of the scheme in the Indictment essentially recites the language of

the mail fraud statute, i.e., it describes a scheme "to defraud . . . and to obtain money and

property" from the Walkers. (Indictment at 2 ¶ 7.) Few details of the charged scheme are

provided. For example, the Indictment itself does not state that it was part of Mr. Newmark's

scheme to keep the money fraudulently obtained, to avoid detection, to conceal past fraudulent

---

principle that once the "jig is up," a subsequent attempted "cover up" act (even if it is a "bad"
act) is ill-suited to "further" the scheme.

acts, to "lull" the Walkers into a false sense of security, etc., or why such acts were part of the scheme. In other words, the Indictment does not hint at, much less describe, the actual or theoretical <u>purpose</u> or the role of the charged mailings in the context of the broader scheme to defraud the Walkers. The Indictment simply lists discrete acts – the mailings, wire transmissions, and false declaration – which occurred well after Mr. Newmark "obtained" money from the Walkers, and charges, without explanation or connection, that these acts were "part of the scheme." Therefore, unlike the indictment in Sampson, which expressly charged that the mailings at issue were sent for the purpose of "lulling said victims" into a false sense of security, the Indictment in this case was entirely silent on that issue or the role of the mailing. The actual presentation of evidence at trial did nothing to tie the mailing to the "scheme" in any meaningful way.

Based on the evidence presented, it is not reasonable to infer that Mr. Newmark intended that the scheme have an indefinite, much less infinite, duration, as the Government essentially contends. To be clear, the Government did not produce any direct evidence that a "scheme" existed at all. As discussed in detail above, the Court concludes that the Government proved that Mr. Newmark participated in a scheme to obtain money from the Walkers. The Government's proof consisted entirely of circumstantial evidence of Mr. Wight's interaction with the Walkers, Mr. Wight's interaction with Mr. Newmark, and Mr. Newmark's interaction with Morgan Stanley. The Government now attempts to stretch that circumstantial evidence beyond its reasonable limits, arguing that "[t]here was no logically anticipated terminal date as part of the scheme, because it was essential to the scheme to continue to conceal the central operative deception: that defendants were operating under the false pretense of being attorneys to effect the

sale of annuities." (Gov't Mem. Opp'n 27.)  The Government argues that this evidence points to

a cover-up and an attempt to limit exposure, and that Mr. Newmark's actions in that regard were

critical to the success of the fraud.

Notwithstanding the foregoing, the mailed answers to interrogatories could not have been

"for the purpose of executing" a scheme to "obtain" money from the Walkers for the

straightforward reason that the money had been "obtained" more than two years prior to when

that mailing occurred.  None of the evidence cited above bespeaks an intent on Mr. Newmark's

part to keep the scheme alive into the indefinite future.  Instead, the facts on which the

Government rely merely evoke an intent to create the misimpression that Mr. Newmark and the

people he employed were attorneys in order to convince the Walkers to purchase annuities.

Undaunted, the Government argues that the jury could have found that "the scheme in

this case contemplated an effort to continue in the insurance business after the Walkers were

bilked, and to defend against civil claims, should victims complain, exactly as Mr. Newmark did

here." (Gov't Mem. Opp'n 18.)  Certainly, the Government sufficiently proved that Mr.

Newmark did in fact continue in the insurance business following the Walkers' annuity

transactions, and that he did defend against the civil claims brought against him by the Walkers.

However, it is a long leap to conclude from those facts that the offending scheme, as

contemplated from the start, necessarily involved a continuing attempt to "conceal" the fraud.  It

is not the case or contention, for example, that Mr. Newmark's entire insurance business was a

sham, perpetrated to coerce the Walkers into believing he would actually invest their money in

appropriate investment vehicles, when, in fact, he intended to abscond with their money.  Indeed,

the opposite appears to be true: Mr. Newmark did, in fact, run a viable insurance business, but

has been accused of posing as a lawyer.

Presumably, any perpetrator of a fraudulent scheme intends for that scheme to succeed, i.e., he seeks to obtain money from the victims, keep the money, and never get caught.  However, evidence that a defendant obtained a victim's money by means of a false misrepresentation is not, in and of itself, evidence that the scheme has a potentially infinite duration, terminating only when the defendant reveals (or the victims uncover) the falsity of the misrepresentation.[27]  The Government refers to other "victims" in its response papers, but it did not present any evidence at trial that Mr. Newmark or the other supposed culprits in this case perpetrated this scheme or any other scheme on any others.  Certainly, the Government did offer evidence that Mr. Newmark sent mailings and made telephone calls advertising Mr. Bohmueller's services that reached thousands of people.  However, the Government has not alleged that those marketing mailings

---

[27] To understand this proposition, conspiracy case law is a helpful guide.  In Grunewald v. United States, 353 U.S. 391, 401-02 (1957), the Supreme Court stated that "after the central criminal purposes of a conspiracy have been attained, a subsidiary conspiracy to conceal may not be implied from circumstantial evidence showing merely that the conspiracy was kept a secret and that the conspirators took care to cover up their crime in order to escape detection and punishment."  In that case, the Supreme Court criticized the Government's attempt to "widen[] the scope of conspiracy prosecutions" by "extend[ing] the life of a conspiracy indefinitely."  Id. at 402.  The Court held:

> We cannot accede to the proposition that the duration of a conspiracy can be indefinitely lengthened merely because the conspiracy is kept a secret, and merely because the conspirators take steps to bury their traces, in order to avoid detection and punishment after the central criminal purpose has been accomplished.

Id. at 405.  Moreover, in the conspiracy context the Supreme Court appears to require "direct evidence that the conspirators originally expressly agreed to conceal the conspiracy," United States v. Steele, 685 F.2d 793, 803 (3d Cir. 1982), and that the "act" in question furthered that purpose.  Id.  As the Court of Appeals has held, per Grunewald, "neither circumstantial evidence permitting an inference of an agreement to conceal, nor direct evidence that the conspirators implicitly agreed to conceal, will satisfy the prosecution's burden of production."  Id.

themselves, or the telephone solicitations, involved any overt misrepresentations.  In addition, the

Government has not alleged that Mr. Newmark (or others under his control) falsely

misrepresented himself (or themselves) as an attorney, or made any other false misrepresentation,

in order to fraudulently deceive any other customers and causing purchases of insurance

products.

The Government relies heavily on the fact that Mr. Newmark's December 16, 2003

mailing contained a fraudulent misrepresentation.  But this fact is not pertinent under the mail

fraud statute absent proof that the mailing itself, fraudulent or otherwise, was mailed "for the

purpose of executing" the scheme.  Indeed, the lawfulness of the substantive content of the

mailing is not determinative, given that the Supreme Court has made clear that even "innocent"

mailings, i.e., those that contain no false information, Parr, 363 U.S. at 390, Schmuck, 489 U.S.

at 715, or routine mailings, Carpenter v. United States, 484 U.S. 19, 28 (1987), may satisfy the

elements of mail fraud as long as they are mailed "in furtherance of" the scheme.[28]

On the basis of the prevailing case law discussed above, together with logic and common

sense, and the extensive and excellent briefing and oral arguments by all counsel on this

particular issue, the Court concludes that the mailing of the interrogatory answers as charged in

Count Three of the Indictment cannot fairly be said to have been sent "for the purpose of

executing" the scheme to obtain money from the Walkers.[29]  For the reasons provided above, a

---

[28] If Mr. Newmark's scheme truly encompassed an organized strategy to conceal his prior fraudulent acts, and avoid all civil liability, then one would have expected an indictment that charged Mr. Newmark for every mailing of every piece of correspondence, pleading or motion filed in the Walkers' civil litigation.

[29] This conclusion should in no way be misinterpreted to excuse or minimize the damage that can be done to the litigation process by failing to punish or penalize appropriately those who

judgment of acquittal will be entered in Mr. Newmark's favor with respect to Count Three of the

Indictment.[30]

### D.     Count 5 – False Material Declaration Under Oath in Violation of 18 U.S.C. § 1623(a)

The jury also convicted Mr. Newmark of one count of making a false material declaration

under oath in violation of 18 U.S.C. § 1623(a), which provides:

---

would erode or abuse the integrity of that process by perpetrating falsehoods in discovery responses. The Court would expect discovery abuses in civil litigation to be met with appropriate sanctions. Nonetheless, in the present case, however reprehensible the spewing of untruthful discovery responses would be from the standpoint of one who seeks to preserve the integrity of the adversarial system, they cannot also be said to be punishable by a conviction for mail fraud.

[30] Mr. Newmark also argues that the Count Three mail fraud charge must be dismissed because the Government failed to prove "causation," i.e., that although Mr. Newmark did not personally mail the interrogatory answers at issue, he may still be charged for mail fraud because he "caused" the mailing. Mr. Newmark argues that the Government did not prove that the charged mailing was reasonably foreseeable to Mr. Newmark, or that the mailing followed in the normal course of business and Mr. Newmark had knowledge of that course of business.

In Pereira v. United States, 347 U.S. 1, 8-9 (1954), the Supreme Court held that one "causes" the mails to be used where he "does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended . . . ." Generally, courts have found the "causation" element to be satisfied fairly easily, and, given the facts of this case, it is certainly not a novel proposition that parties to a civil ligation will exchange discovery documents through the mail. The Government presented evidence that the interrogatories at issue here were, in fact, mailed. However, the Court notes that the Government did not introduce any evidence, either through the testimony of Mr. Lightman or otherwise, that serving interrogatories, or responses thereto, through the mail is customary in civil litigation or that it occurs "in the ordinary course of business." In today's legal environment, it may be just as likely that discovery documents, and numerous other routine mailings that occur frequently during the course of a civil litigation, are delivered by hand, sent by a private courier, or sent through electronic means. The Government did not provide any evidence that the use of the mails in this case was any more foreseeable than any alternative method. Certainly, the Government did not provide any evidence (or argument) that Mr. Newmark had any knowledge that the mails would be used. However, because the Court concludes that a judgment of acquittal must be entered as to Count Three for the other reasons discussed above, the Court need not decide this issue on the basis of Mr. Newmark's "causation" argument.

> Whoever under oath (or in any declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, United States Code) in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration or makes or uses any other information, including any book, paper, document, record, recording, or other material, knowing the same to contain any false material declaration, shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 1623(a) (emphasis added). This Count in the Indictment is based on Mr. Newmark's statement under oath in a January 21, 2004 deposition in the civil litigation that he had never held himself out as an attorney. The deposition was held during the discovery phase of the suit brought by the Walkers against Mr. Newmark and others. The pertinent questions and answers from the deposition are as follows:

> Q.    Do you remember, Mr. Newmark, both in your conversation with Mr. Bogdanoff and in your conversation with Mr. Zeyer falsely telling them that you were an attorney for [the Walkers]?
>
> A.    No.
>
> * * *
>
> Q.    You don't remember that do you?
>
> A.    No.
>
> Q.    You don't recall or you didn't do that?
>
> A.    I've never represented myself as an attorney.
>
> Q.    For [the Walkers] or for anybody?
>
> A.    For anybody.

(Indictment at 7-8.)[31]  Therefore, the statement that Mr. Newmark was convicted of falsely making was, essentially, "I've never represented myself as an attorney for anybody."

Mr. Newmark challenges the Government's evidence with respect to Count Five on three grounds.  First, Mr. Newmark argues that Mr. Zeyer's testimony at trial is insufficient to prove that Mr. Newmark misrepresented himself as an attorney for the Walkers.  Second, Mr. Newmark argues that the Government failed to prove "materiality," which is an essential element of this crime under 18 U.S.C. § 1623(a).  Finally, Mr. Newmark argues that the questions and answers

---

[31] This deposition testimony appears here as it appeared in the Indictment, including the emphasis.  For further context, and as presented at trial, before Mr. Newmark was asked the first question presented in the Indictment, he was asked the following question and gave the following answer:

Q.    Do you remember speaking with Chris Zeyer?

A.    Don't know.

(Gov't Ex. 123, B. Newmark Dep. Excerpt No. 21 at 1, Jan. 21, 2004.)  In the same portion of the deposition transcript, Mr. Newmark was asked the following questions and gave the following answers:

Q.    Do you recall having a telephone conversation with Chris Zeyer on August 31, 2001?

A.    Yes.

Q.    In that telephone call, did you identify yourself as attorney for Arthur and Thomas Walker?

A.    No.

Q.    You did not.  Did you ever hold yourself out to anyone at Morgan Stanley as an attorney for Thomas and Arthur Walker?

A.    No.

(Gov't Ex. 123, B. Newmark Dep. Excerpt No. 21 at 2, Jan. 21, 2004.)

48

from his deposition are so poorly worded, ambiguous, and susceptible of numerous interpretations, that they cannot support a false declaration charge or conviction.

      1.     *Sufficiency of Evidence that Mr. Newmark Misrepresented Himself as an Attorney to Mr. Zeyer*

Mr. Newmark argues that the Government produced insufficient evidence that the false declaration that formed the basis for the § 1623 charge was, in fact, false, and that he knew it was false when he made it. He argues that the Government failed to prove beyond a reasonable doubt that he falsely misrepresented himself as an attorney for the Walkers during his interaction with Morgan Stanley. The basis for this charge lies almost exclusively in the testimony of Mr. Zeyer, who worked in the compliance department at Morgan Stanley in New York City in August 2001. He testified that on August 31, 2001 he received a "verbal complaint" from Mr. Newmark during a telephone call that Mr. Newmark made to Morgan Stanley regarding the Walkers' accounts. (Trial Tr. C. Zeyer 7:9-13.) At trial, counsel for the Government showed Mr. Zeyer a copy of a "verbal complaint form," which Mr. Zeyer testified he had written on the day he received the telephone call from Mr. Newmark, but after the call had concluded. (Trial Tr. C. Zeyer 8:9-14.) The verbal complaint form indicated that the caller's name was Brian Newmark (Trial Tr. C. Zeyer 9:16), and next to Mr. Newmark's name on the form, Mr. Zeyer testified that he had written "Attorney for Arthur and Thomas Walker." (Trial Tr. C. Zeyer 9:17-19.) When asked why he wrote that, Mr. Zeyer responded:

> Because Brian Newmark was not part of the accounts for Arthur or Thomas Walker, he was what's called a third party, somebody that is not listed or indicated on the account itself. When we have somebody like that, when we have a third party, we ask the caller what is their relation to the client. At this time, since I have it written here, I would ask what the relation to the client is and he would tell me – he told me he's an attorney, or he would have just freely indicated that I am an attorney for

. . . Arthur and Thomas Walker.

(Trial Tr. C. Zeyer 9:21-10:5.)  Throughout the text of the verbal complaint form, in which Mr.

Zeyer describes the information Mr. Newmark conveyed to him over the telephone, Mr. Zeyer

referred to Mr. Newmark as "Attorney."  (See Gov't Trial Ex. 90 at 2.)  At trial, counsel for the

Government walked Mr. Zeyer through much of the text of the verbal complaint form.  (See

generally Trial Tr. C. Zeyer 11:11-13:10.)  Mr. Zeyer testified that, at the time of the telephone

conversation in question, it was not significant to him whether the caller (i.e., Mr. Newmark) was

or was not an attorney.   (Trial Tr. C. Zeyer 14:7-13.)

    The Government's counsel asked Mr. Zeyer whether he checked with "the caller" to

confirm any of the information the caller provided, and Mr. Zeyer testified that his "normal

procedure would be is after I have a discussion with a caller or a complainant to read back my

notes, just so I can – just so the – that individual understands of how I'm going to file his

complaint on his behalf or her behalf . . . ."  (Trial Tr. C. Zeyer 14:19-25.)

    At trial, the Assistant U.S. Attorney also walked Mr. Zeyer through the fax cover sheet

that Mr. Newmark had sent to Mr. Zeyer on August 31, 2001, after the telephone conversation

took place.  The name "Bohmueller Law Offices" appears on the top of the fax cover sheet.  In

the text of the fax cover sheet, Mr. Newmark stated:

> Chris: Per our conversation, I am attaching some of the correspondence
> between my clients and your company.  As this has already taken one month, we
> request your immediate attention.
> When this matter is resolved, please notify me by fax at 610-789-7813 as
> the Walkers are anxious to get this resolved.
> Thank you in advance for your help in this matter.
> Sincerely,
> Brian J. Newmark

50

(Gov't Trial Ex. 91.; Trial Tr. C. Zeyer 15:8-17:14 (generally discussing fax cover sheet)).

On cross-examination, defense counsel asked Mr. Zeyer, "[i]s it your testimony, sir, that as you sit here today you have a distinct recollection of this telephone call?"  Mr. Zeyer responded, "No."  (Trial Tr. C. Zeyer 26:23-27:1.)  Further, when asked whether he recalled "word-for-word the conversation with Mr. Newmark as we sit here today," Mr. Zeyer stated that "[a]gain, it probably - it probably just wasn't a memorable conversation, it was just one of many different complaints taken."  (Trial Tr. C. Zeyer 40:24-41:3.)

Defense counsel questioned Mr. Zeyer about the procedures he typically utilized when receiving a complaint call.  Mr. Zeyer summarized those procedures as follows:

> You would receive the call, you would make your notes, you would read them back to the individual for accuracy, you would then at that time when the call is finished is to then to start writing . . . or drafting your verbal complaint.  If the supporting documentation comes in, you collect the supporting documentation and you put it with your verbal complaint.

(Trial Tr. C. Zeyer 28:19-25.)  Notably, Mr. Zeyer never testified that he actually followed these procedures with respect to Mr. Newmark's August 31, 2001 telephone call – a point defense counsel emphasizes now.

Mr. Newmark argues that the Government's evidence does not support its argument that Mr. Newmark unambiguously or unequivocally said to Mr. Zeyer of Morgan Stanley "I am an attorney," or words to that effect.  He argues that the only evidence that could plausibly support the jury's conviction on this count was Mr. Zeyer's testimony, and Mr. Zeyer, in effect, only testified as to what Mr. Newmark "would have" said, but he never stated what Mr. Newmark actually told him.

After repeated review of Mr. Zeyer's testimony, the Court concludes that the

51

Government's evidence is insufficient to prove that Mr. Newmark's deposition statement was false.  In order to prove that Mr. Newmark's deposition statement that he had never represented himself as an attorney is false, the Government must prove that Mr. Newmark actually falsely misrepresented himself as an attorney.  The Government's argument amounts to the contention that if Mr. Zeyer wrote on the verbal complaint form that Mr. Newmark was the "Attorney for Arthur and Thomas Walker," then it must be because Mr. Newmark so stated.

Viewing the evidence in the light most favorable to the Government, as the Court must in considering a Rule 29 motion, the Court concludes that the evidence actually is sufficient to infer at most that Mr. Newmark aggressively sought to create the misimpression that he was an attorney for the Walkers.  The record does not contain sufficient evidence that Mr. Newmark affirmatively misrepresented himself as an attorney.  Mr. Newmark's counsel is correct that the only evidence presented by the Government that plausibly could prove that Mr. Newmark affirmatively "represented" himself as an attorney for the Walkers is Mr. Zeyer's testimony about the telephone discussion between Mr. Zeyer and Mr. Newmark.  However, based on Mr. Zeyer's testimony, it appears equally likely that Mr. Zeyer could have concluded that Mr. Newmark was an attorney either based on statements by Mr. Newmark himself or based on a personal deduction by Mr. Zeyer from a combination of other pieces of information, including information contained in the Walkers' account files, or subsequent communications by Mr. Newmark, including the August 31, 2001 facsimile.

Mr. Zeyer testified candidly that he did not distinctly recall his August 31, 2001 telephone conversation with Mr. Newmark.  Therefore, Mr. Zeyer was unable to, and did not, testify as to exactly what Mr. Newmark said or how he identified himself during this telephone conversation.

It is clear however, that Mr. Zeyer did not affirmatively state that Mr. Newmark actually stated

that he was an attorney.  Instead, he spoke in terms of the process he and his department typically

employed when receiving complaint calls: "When we have somebody like that, when we have a

third party, we ask the caller what is their relation to the client."  (Trial Tr. C. Zeyer 9:24-10:1).

When counsel for the Government asked Mr. Zeyer why he had identified Mr. Newmark as an

attorney on the verbal complaint form, Mr. Zeyer spoke in terms of what Mr. Newmark "would"

have stated.  He testified that on the date in question, "since I have it written here [on the verbal

complaint form], I would ask what the relation to the client is and he would tell me - he told me

he's an attorney, or he would have just freely indicated that I am an attorney . . . ."  (Trial Tr. C.

Zeyer 10:1-4) (emphasis added).  Not unlike Mr. Zeyer's markedly equivocal testimony that led

to the dismissal of Count Two during trial, upon review of the transcript Mr. Zeyer's testimony in

this regard as to Count Five is uncertain and speculative.  He does not remember the telephone

call, and did not testify as to what procedures he utilized on that date.  He merely recounts what

procedures Morgan Stanley's representatives, using the collective pronoun "we," "would have"

utilized in a similar situation, i.e., when an recognized third party calls regarding a specific

account.

Mr. Zeyer's testimony as to what information he relied upon or utilized in creating the

verbal complaint form also is speculative.  He testified that he took handwritten notes, and

reviewed the Walkers' account file on Morgan Stanley's computer system.  In addition, he

testified that when he received additional information, such as the fax Mr. Newmark sent to him

shortly after the telephone call, he "would read through" these documents before preparing the

verbal complaint form.  (Trial Tr. C. Zeyer 28:5-10.)  However, he testified that while he would

53

review additional information, "usually when I write a verbal complaint it's off" his handwritten notes.  (Trial Tr. C. Zeyer 28:10-12.)  Again, Mr. Zeyer provided this testimony in the context of questioning about the process he typically employed, and did not state (or recall) what documents he actually reviewed in preparing the verbal complaint form to memorialize his August 31, 2001 call with Mr. Newmark.

The Court's conclusion is driven by Mr. Zeyer's candid testimony on cross examination that he did not recall his August 31, 2007 conversation with Mr. Newmark.  His lack of recollection permeates the remainder of his testimony, most of which amounts to speculation and conjecture.  Certainly, Mr. Zeyer recognized the documentary evidence that the Government offered, such as the verbal complaint form, and the fax cover sheet that he sent to Morgan Stanley's Scranton branch office containing the materials that he received from Mr. Newmark, as his own work.  However, by and large, even under the relaxed scrutiny of favoring the Government, Mr. Zeyer's testimony cannot be characterized as self-confident, conclusive or qualitatively sufficient to support a conviction on this Count.  He testified about the process he typically employed when receiving complaints, but never testified what process he employed on August 31, 2001.  In short, Mr. Zeyer does not state that Mr. Newmark represented himself as an attorney for the Walkers, or for anybody, and no other direct or circumstantial evidence supports that charge.  Accordingly, a judgment of acquittal will be entered as to Count Five of the Complaint.

However, even if the Court were to conclude that Mr. Zeyer's testimony was sufficient to support the conclusion that Mr. Newmark had represented himself as a lawyer, that would not end the inquiry about Count Three.

54

2.      *Sufficiency of Evidence of "Materiality"*

Mr. Newmark argues that Government's evidence was insufficient to support a jury finding that his false statement during his deposition was "material."  Title 18 U.S.C. § 1623(a) proscribes "knowingly making any false <u>material</u> declaration" under oath in a proceeding before a court.  18 U.S.C. § 1623(a) (emphasis added).  To prove a violation of § 1623(a), the Government was required to show that Mr. Newmark  knowingly made a false material declaration during his deposition in the civil litigation.  <u>See</u> <u>Johnson v. United States</u>, 520 U.S. 461, 465 (1997) ("there is no doubt that materiality is an element of perjury under § 1623"); <u>United States v. McLaughlin</u>, 386 F.3d 547, 552 (3d Cir. 2004) ("'materiality' is an element of . . . 18 U.S.C. § 1623").  Because Mr. Newmark made the disputed statements at a deposition in a civil lawsuit, the Government must prove the statements were material to the underlying civil litigation.  <u>See</u> <u>United States v. Allen</u>, 892 F.2d 66, 68 (10th Cir. 1989) ("The materiality test is determined at the time and for the purpose for which the allegedly false statement was made.").

Materiality under § 1623 requires only that the defendant's statements "[had] a 'natural tendency to influence, or [were] capable of influencing, the decision of the decisionmaking body to which it is addressed.'"  <u>United States v. Gaudin</u>, 515 U.S. 506, 509 (1995) (quoting <u>Kungys v. United States</u>, 485 U.S. 759, 770 (1988)); <u>see also</u> <u>United States v. Barrett</u>, 111 F.3d 947, 953 (D. C. Cir. 1997) (stating that a false statement is material within the meaning of § 1623 if the statement "has a natural tendency to influence, or was capable of influencing, the decision of the tribunal in making a particular determination"); <u>United States v. Adams</u>, 870 F.2d 1140, 1147 (6th Cir. 1989) ("The test of whether a false declaration satisfies the materiality requirement is whether a truthful statement might have assisted or influenced the tribunal in its inquiry.").

55

Certainly, "materiality," an element of the crime charged, must be determined by the jury beyond a reasonable doubt.  Gaudin, 515 U.S. at 522-23.

It is not precisely clear how the concept of "materiality" should be understood in the context of a false statement made during a deposition in a civil suit, as opposed to, for example, a grand jury proceeding.  As the Court of Appeals for the Fourth Circuit has explained, "[g]iven that a deponent's testimony is not actually addressed to a decision-making body, [the materiality] standard does not neatly apply when . . . the defendant is charged with committing perjury in a civil deposition."  United States v. Wilkinson, 137 F.3d 214, 225 (4th Cir. 1998).  The Wilkinson court noted that appellate courts have adopted varying standards for determining the materiality of statements given in depositions.  See id.  The Second Circuit Court of Appeals has held that a statement given in a government deposition in a forfeiture action under 21 U.S.C. § 881 is "material" if "a truthful answer might reasonably be calculated to lead to the discovery of evidence admissible at . . . trial" because such actions, though civil in form, "are predicated upon a nexus between the property and criminal activity."  United States v. Kross, 14 F.3d 751, 754 (2d Cir. 1994).[32]  The Fifth Circuit Court of Appeals similarly held that the materiality of

_____

[32] The Second Circuit Court of Appeals pointed out that in a § 1623 prosecution for false declarations to a grand jury, "matters arguably cumulative or collateral to the grand jury's objective in a given case are considered for their potential to aid that body, not for the probability of assistance from a truthful answer."  United States v. Kross, 14 F.3d 751, 753 (2d Cir. 1994) (United States v. Gribben, 984 F.2d 47, 51 (2d Cir. 1993)).  Materiality in the grand jury context is "broadly construed" because the grand jury's function is investigative.  Id.  Similarly, the Second Circuit noted that the purpose of civil discovery is also investigative, and the scope of discovery includes any information that "appears reasonably calculated to lead to the discovery of admissible evidence."  Fed. R. Civ. P. 26(b)(1).

In Kross, the Second Circuit Court of Appeals noted the narrower standard that had been adopted by the Ninth and Sixth Circuits, but held that the facts presented in Kross, which addressed the materiality of a false declaration made in the context of a government deposition in a forfeiture action under 21 U.S.C. § 881, favored "a broad construction of the definition of

statements given in a civil deposition is not limited to issues specifically raised at trial or

evidence admissible at trial, but includes matters properly the subject of and material to a

deposition under Fed. R. Civ. P. 26(b)(1).  See United States v. Holley, 942 F.2d 916, 924 (5th

Cir. 1991).

By contrast, the Sixth and Ninth Circuits have adopted a "considerably higher standard of

materiality," for § 1623 false declaration prosecutions based on allegedly false testimony

provided during a civil deposition.  Wilkinson, 137 F.3d at 225 (citing United States v. Adams,

870 F.2d 1140, 1147 (6th Cir. 1989);   United States v. Clark, 918 F.2d 843, 847 (9th Cir. 1990)).

In Adams, the Sixth Circuit Court of Appeals held that a false statement given in a deposition is

"material" if a truthful statement might have assisted or influenced the fact finder in the

underlying lawsuit, 870 F.2d at 1147, while in Clark, the Ninth Circuit Court of Appeals defined

"materiality" in this context as whether the false statement had a "tendency to influence, or was

capable of influencing, the decision of the decision-making body to which it was addressed"

from the perspective of the jury in the civil case, 918 F.2d 843, 847 (internal quotation marks

omitted).  The Wilkinson court did not adopt either of these standards, concluding that

"overwhelming evidence establishes that the nature of [the defendant's] false declaration

unquestionably meets the more stringent standard adopted by the Sixth and Ninth Circuits

requiring that the topic of the declaration at issue be discoverable and have the tendency to affect

_____

materiality similar to the approach" used in the grand jury context.  Kross, 14 F.3d at 754.   The
court noted that while a deposition in a forfeiture action under 21 U.S.C. § 881 is civil in form,
forfeiture actions are predicated upon a nexus between the property and criminal activity.  Id.  In
that context, the court adhered to the "broad standard for materiality of whether a truthful answer
might reasonably be calculated to lead to the discovery of evidence admissible at the trial of the
underlying suit."  Id.

the outcome of the civil suit involved." 137 F.3d at 228.

In the underlying civil litigation here, the Walkers alleged claims of fraud against Mr. Newmark, Mr. Wight and others.  The Walkers alleged that Mr. Newmark and people in his employ made false representations to the Walkers in attempting to sell them high-priced annuity products.  Specifically, one of the alleged misrepresentations at issue was the Walkers' allegations that Mr. Newmark or those in his employ falsely held themselves out as attorneys.  <u>However, none of those details were provided to the jury in this criminal trial.</u>  Mr. Newmark now argues that the Government failed to produce any, or at least sufficient, evidence that his false testimony was material to the issues before the fact-finder in that prior litigation because the Government failed to adequately describe the nature and circumstances of the Walkers' civil litigation.  Accordingly, he argues that a judgment of acquittal must be entered with respect to Count Five of the Indictment.[33]

In response to Mr. Newmark's motion, the Government endeavors to present some argument as to why Mr. Newmark's deposition statement that he had not held himself out as a lawyer was "material."  However, read closely, the Government's argument merely amounts to the proposition that Mr. Newmark's false statement at the deposition was "material" because it was false.  Moreover, the Government cites no helpful case law in support of its argument.[34]

---

[33] In the Indictment, Count Five stated that "[i]t was material to the litigation in the Eastern District of Pennsylvania, Civil Action No. 03-3750, to determine whether defendant BRIAN J. NEWMARK ever represented himself as an attorney for AW and TW."  (Indictment at 7 ¶ 2.)

[34] The Government cites only one case, <u>Johnson v. United States</u>, 520 U.S. 461, 470 (1997), in support of its argument that it presented sufficient evidence of "materiality."  <u>Johnson</u> is off point.  Moreover, citation to <u>Johnson</u> arguably is misleading.  In <u>Johnson</u>, the Supreme Court was presented with the question of whether the trial court committed reversible error by

Given the allegations in the civil litigation between the Walkers and Mr. Newmark, there is little doubt that the "topic of the declaration at issue [would] be discoverable and have the tendency to affect the outcome of the civil suit involved." <u>Wilkinson</u>, 137 F.3d at 228.  Mr. Newmark's false statement denying having misrepresented himself as an attorney for the Walkers would certainly "have the tendency to affect the outcome" of a lawsuit in which the identical fraudulent misrepresentation is alleged.  In cases where the Government has laid the necessary groundwork regarding the facts of the underlying action, and the context in which the false statement was made, courts have found the "materiality" element of § 1623 to be satisfied fairly easily.  <u>See</u>, <u>e.g.</u>, <u>United States v. McKenna</u>, 327 F.3d 830, 839-840 (9th Cir. 2003) (finding the "materiality" element to be satisfied where the defendant's statements "were capable – at least to some degree – of affecting the [fact finder's] decision-making process in the civil trial, because they would have been admissible to impeach [the defendant's] credibility if she

---

failing to submit the issue of materiality to the jury.  The issue was <u>not</u> whether the evidence presented to the jury was sufficient to sustain a conviction.  The Supreme Court, as well as the court of appeals, stated the evidence offered at trial supporting materiality was "overwhelming," and that materiality was "essentially uncontroverted at trial" and "remained so on appeal."  <u>Id.</u> Clearly, those are not the circumstances here, where the very issue of the sufficiency of evidence on "materiality" is being contested.

    Secondly, the Government cited <u>Johnson</u> for the proposition that "there is 'no plausible argument' that the lie under oath was 'somehow not material.'" (Gov't Mem. Opp'n 45-46.) This quoted language is taken out of context.  In <u>Johnson</u>, the Supreme Court stated:

> Before the Eleventh Circuit and in her briefing before this Court, petitioner has presented <u>no plausible argument</u> that the false statement under oath for which she was convicted – lying about the source of the tens of thousands of dollars she used to improve her home – was <u>somehow not material</u> to the grand jury investigation.

<u>Id.</u> (emphasis added).  Viewed in context, the quoted language is quite different from the way the Government presented it to the Court, which implied that the Supreme Court held that there cannot possibly be "any plausible argument" that a lie is not material.  However, as a matter of substance a lie is not material simply because it is a lie.  If that was the case, the "materiality" requirement of  § 1623 would be redundant.

testified against the government at trial."); United States v. Sablosky, 810 F.2d 167, 169 (8th Cir. 1987) (finding "materiality" where the false statement "clearly related to the integrity of the evidence and [the defendant's] credibility as a witness" in the underlying litigation, such that the "false statement might have influenced the fact-finder at the 1984 trial in deciding the questions before it."). In the context of a false statement made during the course of a grand jury investigation, "materiality" may be proven by sufficient "evidence of the nature of the grand jury investigation," including evidence establishing the allegations the grand jury was investigating, and how truthful answers from the witness could have assisted that investigation. United States v. Regan, 103 F.3d 1072, 1084-85 (2d Cir. 1997).[35] The government may prove "materiality" by, for example, introducing a transcript of the grand jury proceedings, producing testimony from the foreperson of the grand jury, or producing the testimony of the defendant before the grand jury. See United States v. Ostertag, 671 F.2d 262, 265 (8th Cir. 1982) (citations omitted).

---

[35] In Regan, the Court of Appeals for the Second Circuit rejected the defendant's argument that the Government did not prove "materiality," and affirmed the perjury conviction. 103 F.3d at 1084. The grand jury proceedings involved an investigation by the New York City Police, assisted by federal authorities, in trying to find out whether members of the New York City Police Department Anti-Crime Unit had used illegal tactics in making arrests and had lied about the circumstances of various arrests. On appeal, the court reviewed the trial transcript, which, it concluded, showed that "the government presented ample evidence about the nature of the investigation in relation to which [the defendant] testified before the Grand Jury." Id. The evidence presented at trial included testimony from an Assistant United States Attorney and a New York City Police Officer who described the allegations concerning the Anti-Crime Unit and the resulting investigation of that Unit. Id. These individuals testified that the investigation was still pending when the defendant testified, that significant questions were then still unanswered, and that the defendant was the best person available to answer these questions. Id. The court also noted that both the questions posed to the defendant during his grand jury appearance and his answers were read into evidence, and that "[t]hese questions and answers provided the trial jury with additional information about the nature of the grand jury investigation." Id. The defendant himself testified that the Anti-Crime Unit had been under investigation for two years, and that certain cases about which he testified were subjects of that investigations. Id.

Here, the question arises whether the Government presented to the jury sufficient evidence concerning the circumstances of the Walkers' civil suit, and the context in which Mr. Newmark's false statement arose, so that a jury could find the element of "materiality" to have been proven beyond a reasonable doubt.  Without a sufficient understanding of the claims and issues involved in a civil litigation, the jury would not be equipped to determine whether a statement is "material" to that litigation.

The Government contends that the jury heard a  sufficient description of the circumstances of the Walker-Newmark civil litigation to evaluate whether Mr. Newmark's false statement was "material" to that litigation.  The Government points to the testimony of Gary Lightman, who was the Walkers' attorney in the civil action, the parties' stipulations that Mr. Newmark (and other defendants in the civil litigation) settled for approximately $2.9 million, and the fact that Mr. Newmark settled with the Walkers after the January 21, 2004 deposition at issue.[36]  The Government concedes, however, that "Mr. Lightman did not testify that the civil litigation alleged misrepresentations."  (Gov't Jan. 11, 2008 Letter at 5.)

The Government's concession in this regard is accurate and fundamental to the issue at hand.  At trial the Government did not present any evidence that the Walkers' civil suit involved allegations of fraud or any misrepresentations of fact.  Indeed, very little information about the substance of the civil litigation was presented to the jury at all.  Mr. Lightman merely testified that he represented the Walkers in a "civil action," in which the Walkers sued Mr. Newmark, among others.  (Oct. 18, 2007 Trial Tr. 12:3-13.)  Mr. Lightman did <u>not</u> even testify as to the

---

[36] See <u>infra</u> note 37 regarding the confusion surrounding the issue of when the parties actually settled the Walkers' claims against Mr. Newmark, as well as the Walkers' claims against the other defendants in the civil action.

allegations contained in the Walkers' civil complaint, or of Mr. Newmark's defenses.

The 41 excerpts of Mr. Newmark's and Mr. Wight's depositions from the civil suit that were read to the jury here through Mr. Lightman's testimony do provide various details of the "scheme."  At his January 21, 2004 deposition, as read to the criminal trial jury, Mr. Newmark testified that he sold a "charitable gift annuity" to the Walkers, and that it was the first of those products that he had ever sold.  (Gov't Ex. 123, B. Newmark Dep. Excerpt No. 3, Jan. 21, 2004.) He further testified that the transaction was worth approximately $3.5 million.  (Gov't Ex. 123, B. Newmark Dep. Excerpt No. 4, Jan. 21, 2004.)  Both Mr. Newmark and Mr. Wight testified during their depositions as to their roles in selling the annuities to the Walkers and ensuring that Morgan Stanley facilitated the transaction.  None of the excerpts described the claims or defenses in the civil suit.

In addition, in this prosecution the parties stipulated that:

4.      On June 23, 2003, Arthur and Thomas Walker filed a civil lawsuit against several parties including Brian Newmark and John Wight.  This civil suit was resolved by settlements in December of 2004 with no admissions of fault by any party.[37]

---

[37] The original stipulation, which the Government's counsel read to the jury during the Government's case, stated that the civil suit was resolved in December of 2003 with no admission of fault by any party.  (Oct. 18, 2007 Trial Tr. 188:6-10.)  Immediately thereafter, before the Government rested its case, all counsel agreed that the correct date should have been December 2004, and the Government's counsel noted that correction for the record while the jury was present.  (Oct. 18, 2007 Trial Tr. 189:14-190:2.)

However, it appears that the December 2004 date also was incorrect.  After the Government rested its case in chief, the parties revised the second sentence of paragraph four of the stipulation to read as follows: "This civil suit was resolved by settlements in December of 2003 (as to New Life Corp.), March of 2004 (as to Mr. Newmark) and August of 2005 (as to Mr. Wight), with no admissions of fault by any party."  (Gov't Trial Ex. 112, as revised.)  Although counsel for the Government informed the Court that the parties had revised  the stipulation (Oct. 22, 2007 Trial Tr. 9:24-10:6), the trial transcripts indicate that this revised language was not read to the jury.  Moreover, it is unclear whether the revised stipulation was ever received into

5.      As part of the settlement of this civil suit, Arthur Walker and Thomas Walker received a total of $2.9 million is [sic] cash in addition to the combined total of $723,172.69 in total monthly annuity payments which they previously received.

6.      As part of the settlement of this civil suit, the Walkers' interest in further annuity payments was ended.

(Gov't Ex. 112, Stipulation.)  These stipulations were read into evidence during the criminal trial.  (Oct. 18, 2007 Trial Tr. 188:6-18; 189:14-190:2.)

The challenge presented by the precise materiality issue here requires considerable discipline to strictly review only the evidence actually presented to the jury.  Understandably, counsel who have long figuratively lived and breathed the myriad of details of a case, and even the Court that has heard and read a host of pretrial arguments and presentations, may have some difficulty delineating precisely the line between the evidence presented and a knowledge base about the case.  This may be all the more so for lawyers contemplating an issue about a representation or misrepresentation about someone's supposed status as a lawyer.  That is to say, lawyers may instinctively believe in the importance or potential importance of falsely holding oneself out as a lawyer, a belief that may not be shared or immediately appreciated by lay persons.  Thus, it becomes important to explain to a jury that which may be second nature to the

---

evidence or presented to the jury during their deliberations.  In his response to the defense's post-trial motions, counsel for the Government stated that he was unable to determine which version of the stipulation, the corrected or uncorrected version, was actually submitted to the jury. Therefore, the record indicates that the only evidence submitted on the issue of when Mr. Newmark settled the civil suit with the Walkers, was the reading of the inaccurate stipulation stating that the civil suit "was resolved by settlements in December of 2004," even though Mr. Newmark settled with the Walkers in March of 2004.  In briefing this issue related to Mr. Newmark's post-trial motions, the Government emphasizes the close proximity of Mr. Newmark's allegedly false deposition testimony in January 2004 and the fact that he settled portion of the lawsuit two months later in March 2004.  However, because it is unclear that the jury ever heard accurate evidence of when Mr. Newmark settled the suit, the potential impact of this temporal connection is lost.

trial's principal participants.  Therefore, when the trial transcript is examined with the necessary

blinders that permit review only of the admitted evidence, casting aside counsel's statements and

argument, it becomes surprisingly problematic to find evidence from which this jury could have

concluded properly that Mr. Newmark's false deposition testimony was "material" to the civil

litigation as required for  a conviction under 18 U.S.C. § 1623(a).[38]  To be sure, the deposition

excerpts read into evidence by Mr. Lightman provided considerable details about the "scheme"

that was at issue in the civil litigation as well as in the criminal trial.  However, no one asked Mr.

Lightman - or any witness - any questions about the allegations in the civil case or how Mr.

Newmark's deposition falsehood or falsehoods affected the civil case.  Indeed, the parties

determined that, with the exception of the stipulations cited above and the specific matters in the

Indictment, the parties would make no other reference to the civil suit beyond reading deposition

transcripts.  Looking at the trial transcript here for references to the civil litigation, the

Government only introduced evidence that the Walkers were plaintiffs, Mr. Newmark was a

defendant, the case involved annuities, and that the parties settled the lawsuit.  The evidence

included a correct representation of the settlement amount, but apparently failed to precisely

define when the defendants in the civil action, including Mr. Newmark, actually settled with the

plaintiffs.  There was no explanation to the jury here that the civil suit involved a fraud claim,

misrepresentations (by anyone) about being an attorney or misrepresentations in the sale of

annuities.

---

[38] During the criminal trial, Mr. Thomas Walker testified that he considered it important
to the decision to purchase the annuities that Mr. Wight identified himself as a lawyer.  This
evidence, of course, did not relate to Mr. Newmark and did not relate to the civil litigation.
However, the Court cannot discount the possibility of jury confusion from Mr. Walker's
testimony on that point.

In the civil deposition context, the Government at least should produce sufficient evidence of the nature of the civil action at issue, including the plaintiff's allegations, and how truthful answers from the deponent on the issue at hand could have assisted that litigation. Because the Government failed to carry this burden, the Court must conclude that the evidence presented was not sufficient for the jury to find that the necessary element of materiality of the deposition statement was proven beyond a reasonable doubt. Accordingly, in addition to the reasons discussed above relating to the insufficiency of Mr. Zeyer's testimony, for the failure of the evidence to support a finding of materiality, the Court must enter a judgment of acquittal for Mr. Newmark with respect to Count Five of the Indictment.[39]

### E.     Counts One, Three and Five – Constructive Amendment or Variance

Mr. Newmark argues that the evidence presented by the Government at trial "constructively amended" the Indictment, or created a prejudicial variance because the Government did not prove any fraudulent scheme regarding a "tax deferred annuity" as charged in the Indictment. The Indictment in this case reads:

> Defendants **JOHN N. WIGHT** and **BRIAN J. NEWMARK**, and **NEWMARK's** entity EPA, sold various financial products, including "tax deferred annuities," financial products which involved a gift to a charitable organization, tax benefits, and an income stream, to elderly persons who owned substantial assets.

---

[39] With respect to Count Five of the Indictment, Mr. Newmark also argues that the wording of Mr. Lightman's deposition questions in the civil case was so vague and Mr. Newmark's answers were so ambiguous that they are susceptible to numerous interpretations, some of which were not false or inaccurate, thus supporting overturning the conviction. Essentially, he argues that the combination of ambiguous questions and reasonable interpretations of Mr. Newmark's answers result in plausible, not untrue statements by Mr. Newmark, not the falsehoods that are the necessary predicate for these charges.

However, because the Court will grant Mr. Newmark's Rule 29 motion as to Count Five for the reasons stated above, the Court will not consider these additional interpretative arguments.

(Indictment at 1-2 ¶ 4.)  Thereafter, the Indictment refers to "tax deferred annuities" whenever it references the precise products sold by the Defendants to the Walkers.  Mr. Newmark argues that the annuities at issue in this case were not actually "tax deferred," and notes that the term "charitable gift annuities," which accurately describes the financial products sold in this case, does not appear anywhere in the Indictment.

Considerable discussion in a host of cases highlights the lines of demarcation between impermissible constructive amendments or variances on the one hand and inoffensive differences between the language in the indictment and the trial evidence on the other.  "There are two types of variations between the charges in an indictment and the evidence at trial: (1) amendments of the indictment when its charging terms are altered; and (2) variances, where the charging terms of the indictment are not changed but when the evidence at the trial proves facts materially different from those alleged in the indictment."  United States v. Daraio, 445 F.3d 253, 259 (3d Cir. 2006) (citing United States v. Castro, 776 F.2d 1118, 1121 (3d Cir. 1985)).

"An indictment is constructively amended when, in the absence of a formal amendment, the evidence and jury instructions at trial modify essential terms of the charged offense in such a way that there is a substantial likelihood that the jury may have convicted the defendant for an offense differing from the offense the indictment returned by the grand jury actually charged."  Id. at 259-60.  Thus, "'a court cannot permit a defendant to be tried on charges that are not made in the indictment against him.'"  Id. at 260 (citing Stirone v. United States, 361 U.S. 212, 217 (1960)).  "'The key inquiry is whether the defendant was convicted of the same conduct for which he was indicted.'"  Id. (citing United States v. Robles-Vertiz, 155 F.3d 725, 729 (5th Cir.

1998).

The court of appeals has recognized that "'the line between a constructive amendment and a variance is at times difficult to draw.'" Id. at 261 (quoting United States v. Adamson, 291 F.3d 606, 615 (9th Cir. 2002). There is a variance "'where the charging terms [of the indictment] are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment.'" Id. (quoting Castro, 776 F.2d at 1121). The court stated:

> When there has not been a constructive amendment of the indictment but rather there only has been a variance between the facts alleged in the indictment and the evidence offered at trial, the proceedings at the trial will not have usurped the constitutionally guaranteed role of the grand jury. Instead, the concerns raised by a variance argument are the fairness of the trial and the protection of the defendant's right to notice of the charges against her and her opportunity to be heard.

Id. (citing Kotteakos v. United States, 328 U.S. 750, 757-58 (1946); Berger v. United States, 295 U.S. 78, 81-82 (1935)). "'[T]he variance rule, to the extent that it is constitutionally required, is more of a due process rule than is the flat fifth amendment prohibition against being tried on an indictment which a grand jury never returned.'" Daraio, 445 F.3d at 261-62 (quoting United States v. Crocker, 568 F.2d 1049, 1059 (3d Cir. 1977)). In order to reverse a conviction due to a variance, the variance must be likely to have surprised or otherwise has prejudiced the defense. See United States v. Schurr, 775 F.2d 549, 553-54 (3d Cir. 1985). To demonstrate prejudice from a variance, a defendant "must show (1) that there was a variance between the indictment and the proof adduced at trial and (2) that the variance prejudiced some substantial right." United States v. Balter, 91 F.3d 427, 441 (3d Cir. 1996). "A variance does not prejudice a defendant's substantial rights (1) if the indictment sufficiently informs the defendant of the charges against him so that he may prepare his defense and not be misled or surprised at trial,

[or] (2) if the variance is not such that it will present a danger that the defendant may be prosecuted a second time for the same offense." United States v. Schoenhut, 576 F.2d 1010, 1021-22 (3d Cir. 1978); see United States v. Daraio, 445 F.3d 253, 262 (3d Cir. 2006).

Mr. Newmark's correctly cites a technical inaccuracy in the Indictment in that the annuities sold to the Walkers were not in fact "tax deferred."  However, the Indictment does accurately describe the annuities as "financial products which involved a gift to a charitable organization, tax benefits, and an income stream."  (Indictment at 1-2 ¶ 4.)  Expert witnesses called by the Government and for the defense both testified at trial that the annuities at issue in this case embodied these three characteristics.  "Tax deferred annuities" was merely the convenient shorthand term that was used to refer to the annuities products in this case. Therefore, although the Indictment may have inaccurately labeled the financial instruments that the Walkers actually purchased, the Indictment accurately describes the characteristics of those products.  On this basis, Mr. Newmark cannot credibly argue that he was convicted of offenses that were not charged in the Indictment, which could constitute a constructive amendment, or that the Indictment misinformed him so that he did not have fair notice of the actual charges against him, which could constitute a variance.  Accordingly, Mr. Newmark's motion on these grounds will be denied.

## II.    MR. NEWMARK'S RULE 33 MOTION FOR A NEW TRIAL

Under Federal Rule of Criminal Procedure 33, upon the defendant's motion, the Court "may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a) (emphasis added).  "Although the standard of review for a motion for a new trial is broader than that for acquittal, motions for new trials are disfavored and are only granted with

great caution and at the discretion of the trial court." United States v. Martinez, 69 Fed. App'x

513, 516 (3d Cir. 2003) (non-precedential) (citing United States v. Allen, 554 F.2d 398, 403

(10th Cir. 1977)).  Further, Rule 33(a) relief is permissive, rather than mandatory.  Id.

The Court may grant a Rule 33 motion if (1) the verdict is against the weight of the

evidence or (2) if an error occurred during trial and it is reasonably possible that such error

substantially influenced the jury's decision, or would require reversal on appeal.  Our court of

appeals has described a district court's consideration of a Rule 33 motion for a new trial based on

the "weight of the evidence" as follows:

> A district court can order a new trial on the ground that the jury's verdict is contrary
> to the weight of the evidence only if it "believes that 'there is a serious danger that
> a miscarriage of justice has occurred – that is, that an innocent person has been
> convicted.'"  United States v. Santos, 20 F.3d 280, 285 (7th Cir. 1994) (quoting
> United States v. Morales, 902 F.2d 604, 606 (7th Cir. 1990)).  Unlike an
> insufficiency of the evidence claim, when a district court evaluates a Rule 33 motion
> it does not view the evidence favorably to the Government, but instead exercises its
> own judgment in assessing the Government's case.  See United States v. Lacey, 219
> F.3d 779, 783-84 (8th Cir. 2000); United States v. Ashworth, 836 F.2d 260, 266 (6th
> Cir. 1988).

United States v. Brennan, 326 F.3d 176, 188 (3d Cir. 2003) (quoting United States v. Johnson,

302 F.3d 139, 150 (3d Cir. 2002)).

In support of his Rule 33 Motion, Mr. Newmark offers the same arguments that he

offered in support of his Rule 29 motions, which the Court discussed in great detail above.

Because the Court is unaware of any additional evidence that the Government would offer on

Counts Three and Five and will enter a judgment of acquittal for Mr. Newmark as to Counts

Three and Five pursuant to Rule 29, the Court need only consider his Rule 33 Motion as it would

apply to Count One.  However, for the same reasons provided above, the Court finds that the

69

jury's verdict with respect to Count One was not contrary to the weight of the evidence.

Accordingly, Mr. Newmark's Rule 33 Motion is denied on this basis.

Mr. Newmark also argues that the Government's failure to disclose certain evidence or information to the defense warrants the Court vacating the judgment in this case. Specifically, Mr. Newmark points to (1) the Government's failure to disclose that Mr. Zeyer had no memory of the telephone call with Mr. Newmark, which information Mr. Newmark claims Mr. Zeyer revealed on cross-examination during the course of the trial, and (2) the Government's failure to timely disclose that Thomas Walker suffered from dementia.

Under Brady v. Maryland, 373 U.S. 83 (1963), in a criminal case the prosecution is required to produce any information that is or may be exculpatory to the defense. In addition, under Giglio v. United States, 405 U.S. 150 (1972), the prosecution must produce any information it possesses that impeaches or may lead to the impeachment of a government witness. Brady "'is not a discovery rule, but a rule of fairness and minimum prosecutorial obligation.'" United States v. Starusko, 729 F.2d 256, 262 (3d Cir. 1984) (quoting United States v. Beasley, 576 F.2d 626, 630 (5th Cir. 1978)). "There can be no violation of Brady unless the government's nondisclosure infringes the defendant's fair trial right." Id. (citing United States v. Higgs, 713 F.2d 39, 42-43 (3d Cir. 1983). To constitute a Brady violation, the nondisclosure "must adversely affect the court's ability to reach a just conclusion, to the prejudice of the defendant." Id. (citing United States v. Campagnuolo, 592 F.2d 852, 861-62 (5th Cir. 1979). "'No denial of due process occurs if Brady material is disclosed in time for its effective use at trial.'" Id. (quoting Higgs, 713 F.2d at 44). Moreover, "the government is not obliged under Brady to furnish a defendant with information which he already has or, with any reasonable

diligence, he can obtain himself." Id. (citing Campagnuolo, 592 F.2d at 861).

With respect to Mr. Zeyer's testimony, there is no indication that the Government deliberately withheld from the defense the fact that Mr. Zeyer did not specifically recall his telephone conversation with Mr. Newmark.  To the contrary, it appears that this information arose for the first time only at trial and during cross-examination.  Defense counsel had the opportunity to cross-examine him with respect to his memory of the telephone call with Mr. Newmark (or lack thereof), and did so.  Thus, there is no Brady violation.

With respect to Mr. Newmark's argument that the Government's failure to timely disclose that Thomas Walker suffered from dementia warrants a new trial, he asserts that the Government did not disclose a psychological report on Thomas Walker prepared by Dr. Frederick W. Schaerf until Saturday, October 20, 2007, after the Government had rested its case-in-chief.  Dr. Schaerf's report contained his observation that Thomas Walker suffered from symptoms of dementia.  In addition, Mr. Newmark argues that the report contained exculpatory statements by William Giles, who is a friend of the Walkers and serves as Thomas Walker's caretaker.

Mr. Newmark declined to file a motion for a mistrial when he was informed of Dr. Schaerf's report, and declined to move for a continuance to prepare for an examination of any witness who could speak to the contents of the report.  Instead, counsel stipulated to read portions of the report into evidence.  In addition, the conclusion of  Dr. Schaerf's report – that Mr. Walker was competent to testify – was already known to, and conceded by, defense

counsel.[40]  Mr. Newmark's counsel had the opportunity to examine Mr. Walker and Mr. Giles

<u>after</u> the pertinent information was disclosed, but declined to do so.

Moreover, Mr. Newmark has not explained how it is that not receiving Dr. Schaerf's

report prior to trial prejudiced his defense.  The parties agreed that Mr. Walker was competent to

testify, and the defense knew that Mr. Walker would be called to testify on behalf of the

Government.  Any issues with respect to Mr. Walker's mental capacity or acuity, therefore,

naturally would concern his credibility as a witness rather than his competency to testify.  The

jury heard evidence that Mr. Walker suffered from dementia, and it was free to consider that

factor when reflecting upon his testimony.  Because Mr. Newmark had the relevant information

in time to use at trial, and because Mr. Newmark has offered no reasonable argument that the

Government's failure to timely disclose this information infringed upon his "fair trial right,"

there is no <u>Brady</u> violation.

For the reasons stated above, Mr. Newmark's Rule 33 Motion is denied.

---

[40] The defense had been aware of a potential issue as to whether Thomas Walker suffered from dementia at least since March 2007, when counsel for the Government forwarded an August 22, 2003  report by Dr. John Meyers, the Walkers' family physician.  In that report, Dr. Meyers opined that Mr. Walker exhibited early signs of dementia of the "Alzheimer's type." Defense counsel did not take any action on this information until September 18, 2007, one week before trial initially was scheduled to begin on September 25.  At that time, during a pretrial conference, defense counsel raised the issue of Mr. Walker's possible dementia and began to question whether Mr. Walker was competent to testify.  Thereafter, the Defendants filed a Joint Defense Motion for Mental Evaluation, or in the Alternative, for a Hearing on Mr. Walker's Competency.  The Court permitted the parties to conduct a mental examination of Mr. Walker, the defense and the Government each retained an expert to examine Mr. Walker, and Mr. Walker submitted to both evaluations.
Both experts determined that Mr. Walker was competent to testify, and through informal communications with the Court, counsel for the Defendants agreed to withdraw their motion challenging Mr. Walker's competency.  Moreover, on October 15, 2007, counsel for Mr. Newmark stated on the record that the issue of Mr. Walker's competency as a witness was withdrawn.  (Oct. 15, 2007 Trial Tr. 3:1-10.)

72

### III.    MR. NEWMARK'S RULE 34 MOTION TO ARREST JUDGMENT

Rule 34(a) provides that "[u]pon the defendant's motion or on its own, the court must

arrest judgment if: (1) the indictment or information does not charge an offense; or (2) the court

does not have jurisdiction of the charged offense."  Fed. R. Crim. P. 34(a).  In deciding a Rule 34

motion, "[a] court may not look beyond the face of the 'record' which consists of 'no more than

the indictment, the plea, the verdict . . . when the plea is "not guilty" . . . and the sentence . . . .'"

United States v. Buckeridge, Crim. No. 2007-17, 2007 U.S. Dist. LEXIS 79613, at *5 (D.V.I.

Oct. 22, 2007) (quoting United States v. Stolon, 555 F. Supp. 238, 239 (E.D.N.Y. 1983) (quoting

United States v. Bradford, 194 F.2d 197, 201 (2d Cir. 1952))); see also United States v. Diaz,

Crim. No. 92-78, 1993 U.S. Dist. LEXIS 3569, at *5 (E.D. Pa. Mar. 25, 1993) ("A Rule 34

motion must be based solely on a defect apparent on the face of the indictment itself, and not on

the sufficiency of the evidence adduced at trial.") (citing United States v. Sisson, 399 U.S. 267,

280-81 (1970))).

Mr. Newmark incorporates his Rule 29 arguments in support of his Rule 34 Motion, in

effect recasting his Rule 29 motion and Rule 33 motion as a Rule 34 motion as well.  However,

because the Indictment in this case charges appropriate offenses and the Court had proper

jurisdiction of each charged offense, this Motion is denied.

### IV.    MR. WIGHT'S RULE 29 MOTION FOR JUDGMENT OF ACQUITTAL

Mr. Wight also moved for judgment of acquittal under Rule 29(a) with respect to Count

Four of the Indictment.  Count Four charged Mr. Wight with the December 17, 2003 mailing,

through his attorney, of answers to interrogatories in the civil suit brought by the Walkers against

Messrs. Wight and Newmark, among others.  The evidence produced by the Government in

support of these charges, and the theories advanced by the Government as to why these charges should remain, largely are identical to the evidence and arguments concerning Count Three, which are discussed in detail above.  Thus, for the same reasons Mr. Newmark's Rule 29(a) Motion will be granted as to Count Three, Mr. Wight's Rule 29(a) Motion will be granted as to Count Four.  The Government did not present sufficient evidence that Mr. Wight's December 17, 2003 mailing of interrogatory answers was "in furtherance" of the scheme to defraud the Walkers.  Because the facts and law discussed above in reference to Mr. Newmark's motion apply equally to Counts Three and Counts Four of the Indictment, a judgment of acquittal will be entered for Mr. Wight on Count Four.

**CONCLUSION**

For the reasons provided above, Mr. Newmark's Rule 29 Motion for Acquittal will be granted in part, and a judgment of acquittal will be entered in his favor with respect to Counts Two, Three and Five of the Indictment.  Mr. Newmark's Rule 29 Motion will be denied in all other respects, and his Rule 33 and Rule 34 Motions also will be denied.

Mr. Wight's Rule 29 Motion for Acquittal will be granted, and a judgment of acquittal will be entered in his favor with respect to Counts Two and Four of the Indictment.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | **CRIMINAL NO. 06-447** |
| | : | |
| v. | : | |
| | : | |
| BRIAN J. NEWMARK | : | |
| JOHN N. WIGHT | : | |
| Defendants. | : | |

**O R D E R**

**AND NOW**, this 4th day of April, 2008, after consideration of the motions identified

below filed by Brian J. Newmark and John N. Wight, the Government's responses thereto, and

the various reply briefs and letter memoranda the parties submitted in support of their respective

positions, and after oral argument on these motions, for the reasons provided in the

Memorandum accompanying this Order, **IT IS ORDERED** that:

1.      Mr. Newmark's Motion for Acquittal Under Rule 29 at the Close of the Government's

        Case (Docket No. 96), as supplemented by his Supplemental Motion for Acquittal Under

        Rule 29 at the Close of the Government's Case (Docket No. 110) is **GRANTED IN**

        **PART** and **DENIED IN PART** as follows:

        A.      With respect to **COUNTS THREE** and **FIVE** of the Indictment, the Motion

                (Docket Nos. 96, 110) is **GRANTED**, and the Clerk of Court shall enter a

                **JUDGMENT OF ACQUITTAL** in favor of Brian J. Newmark as to those

                Counts.

        B.      The Motion (Docket Nos. 96, 110) is **DENIED** in all other respects.

2.      Mr. Newmark's Motion for Acquittal under Rule 29(c), New Trial under Rule 33(a) and

        Arrest of Judgment under Rule 34(a) (Docket No. 111), as supplemented by his Motion

for Acquittal under Rule 29(c), New Trial under Rule 33(a) and Arrest of Judgment under

Rule 34(a) with Annotations to the Trial Transcript (Docket No. 131) is **MOOT IN**

**PART** and **DENIED IN PART** as follows:

> A.  With respect to **COUNTS THREE** and **FIVE** of the Indictment, the Motion
>
> (Docket Nos. 111, 131) is **MOOT**.
>
> B.  The Motion (Docket Nos. 111, 131) is **DENIED** in all other respects.

3.  Mr. Wight's Motion for Acquittal (Docket No. 109) is **GRANTED**, and the Clerk of

Court shall enter a **JUDGMENT OF ACQUITTAL** in favor of John W. Wight as to

**COUNT FOUR** of the Indictment.

**IT IS FURTHER ORDERED** that for the reasons discussed on the record in open court

on October 17, 2007 and October 19, 2007, the Clerk of Court shall enter a **JUDGMENT OF**

**ACQUITTAL** in favor of Brian J. Newmark and John W. Wight as to **COUNT TWO** of the

Indictment.

BY THE COURT:


S/Gene E.K. Pratter
Gene. E.K. Pratter
United States District Judge

2